**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email:  rprongay@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKE PACIGA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>vs.<br><br>INVUITY, INC., PHILIP SAWYER and JAMES H. MACKANESS,<br><br>Defendants. | Case No.:<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>**DEMAND FOR A JURY TRIAL**</u> |

Plaintiff Mike Paciga, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Invuity, Inc. ("Invuity" or the "Company"), as well as media and analyst reports about the Company and conference all transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of common stock of Invuity between July 19, 2016 and November 3, 2016, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.     Venue is proper in this district pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred and Invuity's headquarters are located in this District.

## PARTIES

4.     Plaintiff Mike Paciga purchased Invuity common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

5.     Defendant Invuity is a California corporation with its principal executive offices located in San Francisco, California. Invuity is a medical technology company that develops, markets, and sells single-use and reusable medical technology for use by surgeons across the United States. The Company focuses on advanced photonics products that enable physicians to have a better visualization of the surgical cavity when performing minimally invasive and minimal access procedures.

6.     Defendant Philip Sawyer ("Sawyer") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Invuity and a member of its Board of Directors.

7.     Defendant James H. Mackaness ("Mackaness") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Invuity.

8.     Defendant Sawyer and Mackaness are referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants served as Invuity's executive management and oversaw the Company's operations and finances. The Individual Defendants were intimately knowledgeable about all aspects of Invuity's financial and business operations. They were also intimately involved in deciding which disclosures would be made by Invuity. The Individual Defendants made various public statements for Invuity during the Class Period, and participated in Class Period analyst conferences.

**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

10.     The Class Period begins on July 19, 2016. On July 19, Invuity announced its second quarter 2016 financial results for the reporting period ended June 30, 2016. Defendant Sawyer praised the increasing growth at Invuity, stating in pertinent part as follows:

> "We had a strong second quarter highlighted by 73 percent revenue growth and continued execution on our development plans to expand our advanced photonics technology to additional complementary surgical procedures and modalities," said President

and CEO Philip Sawyer.  "We are pleased with our progress to date and excited about our momentum towards the widespread adoption of our unique devices and technologies, which provide meaningful clinical and economic value to surgeons and hospitals."

11.     During the July 19 earnings conference call with analysts, Defendant Sawyer emphasized the Company's confidence that it would continue to report increasing revenue growth in its current accounts. In pertinent part, Defendant Sawyer stated:

> ***In the quarter, we saw significant progress in both the expansion of our active accounts, as well as an increase in revenue per account.*** We had approximately 610 active accounts, a 37% increase over the 445 active accounts in Q2 2015 and a sequential increase of 12% over the 545 accounts from last quarter.
>
> ***Revenue per account was $12,500 in the quarter, an increase from $10,400 in Q2 2015, demonstrating our ability to go deeper in each account.*** We remain highly focused on both continuing to add accounts, as well as expanding our utilization within our current active accounts.
>
> ***We continue to see evidence that once we have a foothold in an account that we can be successful in expanding the number of specialties that use our products.*** Overall, we are executing well and building strong commercial momentum.
>
> ****
>
> I'm really pleased by our strong performance in the second quarter and confident that we are building a solid foundation for long-term growth. We have a significant $2 billion US market opportunity with our current products. We have unique devices and technologies that provide meaningful clinical and economic value to surgeons and hospitals. ***And finally, we have multiple ways to grow our business and remain focused on adding new accounts, expanding penetration in our existing accounts and adding new complementary products to leverage our commercial investment.*** (emphasis added).

12.     During the same conference call, Defendant Mackaness echoed Defendant Sawyer's enthusiasm and further emphasized the growth in revenue per active account, stating in pertinent part as follows:

> Thank you, Phil. Invuity posted strong results in the second quarter of 2016. Revenue was $8.2 million, a 73% increase over last year's

second quarter of $4.7 million and a 28% increase sequentially over the $6.4 million reported for Q1 2016 *driven by an increase in active accounts and growth in revenue per active account.*

\*\*\*\*

Turning to the rest of the year, we are maintaining our revenue guidance for 2016 of $35 million to $37 million. As I commented earlier, we continue to expect further gross margin expansion from our normalized gross margin of 72% due to our anticipated increase in sales volumes going forward, but expect improvements to be of a more modest nature than we've experienced over the last two quarters. (emphasis added).

13.     During the Question and Answer portion of the conference call, Defendant Mackaness spoke about the Company's across-the-board growth in revenue per account. In pertinent part, the exchange proceeded as follows:

**Matthew O'Brien, Piper Jaffray - Analyst**

Okay, so when we back that out, your product revenue in the quarter, about $7.7 million, quite good sequentially. *Clearly, a very strong improvement in the number of accounts, but more importantly the revenue per account.* Can you just talk a little bit about if that's a broad-based improvement that you are seeing across multiple procedural areas, or is that really contained to breast or some other area that's driving a majority of that growth? And how should we speak about that type of performance going forward?

**Jim Mackaness, Invuity, Inc. - CFO**

Yes, we would classify it as broad-based. As you know, it can be a little bit more qualitative than quantitative on tracking our products to the actual procedures, but we did do a synergy check with the sales channel and they felt that the percentage sold across the disciplines remained constant, so I'd say it was a broad-based penetration. *I do think it's worth noting that it was impressive to have that number, as well as the significant tickup in active accounts, so firing on both cylinders there for this quarter.* (emphasis added).

14.     Also during the Question and Answer portion of the conference call, Defendants Sawyer and Mackaness addressed several questions on the Company's productivity growth and

the risk of flat lining in older customer accounts. In pertinent part, the exchanges proceeded as follows:

**Drew Ranieri, Stifel Nicolaus - Analyst**

It's Drew Ranieri on for Rick. But just to maybe start on rep productivity, Phil and Jim, you've both talked before about targeting rep productivity in the $1.5 million range, and clearly there's multiple levers to get there, but could you just help us bucket productivity growth? ***Is this going to be based on additional products in the portfolio or more procedure penetration or just adding more accounts?*** Can you just help us think through that a little bit?

**Jim Mackaness, Invuity, Inc. - CFO**

Yes, we definitely think upon it multiple axes, multiple ways that we can continue to build that productivity in the territory. So for sure obviously new accounts, a lot of opportunity to continue to penetrate, as I said, into additional hospitals. ***Also going deeper into the hospitals, which we showed this quarter with the active account revenue growing, so that's there. Talking about things like for example now accessing gynecology within existing sites gives us that incremental ability to go deeper. So that's always been part of the strategy that continues to play out.***

\*\*\*\*

**Ben Andrew, William Blair - Analyst**

Okay. Just trying to understand that. And then you did give us some good updates on the same-store growth per account, revenues and things like that. ***Have you seen a plateauing at all in some of your more mature accounts, or is the rate of change still really encouraging as you continue to go deeper and/or add procedures?***

**Philip Sawyer, Invuity, Inc. - President & CEO**

***We have not seen plateauing.*** We've been very encouraged by the -- at our smaller stage of company, the ***seemingly open-ended opportunity available to us to go deep in hospitals*** because when you think about it, we first penetrate the hospitals through on average somewhere between two and three surgeons, and then you have an opportunity to go to more surgeons, to then go to more specialties. This is all with one or two products. Then you have an opportunity to sell additional products into the hospital and ***you***

***can see how you could have easily a 5 to 10 times multiplier from when you first get into a hospital to how the business really develops over time***. (emphasis added).

15.     On July 20, 2016, the Company filed its second quarter Form 10-Q with the SEC and reported a 73% increase in revenue, a 13.6% increase in gross margin, and 37.1% increase in purchases of Invuity devices and products, as compared to the second quarter in 2015. In response to the earnings release, the Company's stock rose more than 13%.

16.     The statements referenced above in ¶¶ 10-15 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts known by Defendants during the Class Period:

(a)     That the continued opportunities for growth in mature active accounts stagnated after the initial sale of a new product;

(b)     That revenues per active account were actually declining;

(c)     That the Company's sales force was not meeting stated revenue growth goals in mature active accounts; and

(d)     As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis at the time the statements were made.

### THE TRUTH IS REVEALED

17.     On November 3, 2016, after the close of trading, Invuity reported its third quarter 2016 earnings for the period ended September 30, 2016. The release stated the Company had dramatically cut its revenue expectations and 2017 guidance. In pertinent part, Defendant Sawyer stated as follows:

"While we achieved 52% revenue growth in the third quarter, results were lower than our expectations due to seasonality ***and lower than anticipated revenue per account.***

****

Invuity now expects revenue for 2016 to range from $32 million to $32.5 million, as compared to prior guidance of $35 million to $37 million. Our current guidance represents annual growth of approximately 50% over 2015.

The Company is introducing revenue guidance for 2017 in the range of $42 million to $44 million.

18. During the November 3 conference call with analysts, Defendant Sawyer explained how lower revenue per active account had hampered the Company's prospects. In pertinent part, Defendant Sawyer stated as follows:

Although our revenue growth this quarter was strong at 52%, it was lower than expected. ***The primary reason for the shortfall was lower revenue per active account than anticipated***. While we saw a significant and encouraging increase in accounts this quarter, revenue per account declined sequentially from 12,500 in Q2 to 11,500 in Q3. While a [percentage] of this decline was likely related to the impact of lower overall procedural volumes due to seasonality.

***I would also note that the continued increase in active accounts has made it difficult to significantly increase the average revenue per account.*** We do have a number of mature accounts that have grown to a significant revenue number, but we have to put we have work to do to drive this depth of penetration across all our active accounts. While we expect to see sequential revenue growth in the fourth quarter, we're only forecasting a modest improvement in average revenue per account in the quarter as the ongoing increase in our base of active accounts is anticipated to largely offset expected procedural volume gains in the quarter. ***Based on this expectation, we're reducing our 2016 revenue guidance to a range of 32 million to 32.5 million, which represents approximately 50% growth over the last year.***

****

Turning to our outlook going forward. ***Recognizing the slower growth in our average revenue per active account, we are lowering our revenue guidance for 2016 to 32.5 million which equates to approximately 50% growth over last year.*** But this is lower than our original range of 35 to 37 million.

****

For 2017, we are introducing revenue guidance of 42 to 44 million which represents growth of approximately 30 to 35% percent over the midpoint of our 2016 guidance. In 2017 we expect gross margins will be in the mid-70s based on anticipated increases in sales volumes will come through currently with the size of our sales force and therefore anticipate modest increase in quarterly operating expenses, and we seek to prudently manage our capital resources. (emphasis added).

19.    Defendant Mackaness fielded additional questions from analysts regarding the Company's surprisingly low quarterly revenue. In pertinent part, the exchange went as follows:

**Richard Newitter**

Hi. Thanks for taking the questions. So, I'd like to just start with the outlook production. I just want to make sure I'm fully understanding kind of what's driving or what's changed really kind of since last quarter to this quarter. And I appreciate maybe there's some incremental seasonality, but, you know, you were still trending at a 50% rate in the third quarter. You still expect a 50% growth rate in the fourth quarter. Can you just talk a little bit specifically about what's stopping you from getting deeper, or what stopped the momentum that you were seeing presumably up until the third quarter to drive that depth? Is it a particular procedure that is harder to do? Is there something that's going on at the hospital level were driving adoption is - or getting through the value committees tougher? Can you can you elaborate a little bit there?

**Jim Mackaness**

So at the very end of Q3 we were surprised that we weren't closing the quarter at higher sales volume and into the early part of Q4. And despite the fact that we were bringing on many new accounts we were lower in Q3. So, this is towards the very end of the quarter than we thought we were going to end up. And we've been adding so many accounts as you saw in the numbers over the past year and even this past quarter when we kept grabbing the numbers and trying to look for trends what we saw is that the base of accounts, the utilization of those accounts on a quarterly basis was creating at a rate slower than we anticipated.

And as you saw, we announced the quarter before a higher overall utilization rate approximately 12-1/2. And what we increasingly came to understand through looking at all the numbers and we have we have accounts that have many different buying patterns. ***And as we got more and more accounts the trend became clearer as we've been looking at the last series of weeks that are creating so many new customers is great for the top line, but it also has its***

*challenges because they tend to order more in the first order, and then they drop to a level rate in the next order, which then has to build up over time.*

And if you think of our business as a line that compounds over time, if you remove that compounding - and first of all the accretion the adds over a couple quarters and then add the compounding that ripples through our installed base to result in lower numbers. And so it was looking at the trends now in the clearest current fashion that led us to want to have at least that clarity that we saw given what we looking at now to the outside world. (emphasis added).

20.     Defendant Mackaness also addressed inquiries from an analyst regarding the dramatic decline in revenue per account and the large, unexpected reduction in 2017 guidance. In pertinent part, those exchanges are as follows:

**Matt O'Brien**

Good afternoon. Thanks for taking a question. Just to follow-up a little bit on Rich's question. First question, I'm still not quite sure I understand what it is, you know, on an account basis that seems to have slowed here. You know, I could understand Q3, but *the outlook really calls for a pretty dramatic slowing on a per account basis.* So, it would seem to me with, you know, the numbers that you're providing for next year being, you know, dramatically below the street that there's something more fundamentally happening beyond just the pace in which they're adding accounts. So, is there anything else you can detail as far as what may be going on there?

**Jim Mackaness**

Matt, this is Jim. I'll just take another swing at as well. I think definitely what we've seen is if you look at the active account revenues you saw an increment up through the end of Q2. And then to your point, we obviously saw it step down in Q3. And where went in and started analyzing and talk it over the sales force and continued to really sift through the trends, you know, what we've seen is we've seen that growing active account base which is great - the new accounts coming in. *The new accounts, as Phil mentioned, do have a diluted effect in the early stages. They move through a maturation cycle. So, as we put more new accounts in it kind of pulls that average down.* We do see success in going deeper in certain accounts but at this stage we've not really been able to see that deeper going across all of the active accounts as we kind of anticipated.

So, it's that is the rate of being of being able to get all of the other active accounts to behave like our leading cohort if you like and basically getting deeper. And that's why, as Phil has mentioned, there's a lot of effort and focus now on having these specific programs and perhaps the clinical apt as well to really unlock that and able to get that going deeper trend to occur across the whole installed base to be at a drive that average active account revenue north. ***We've kind of got ourselves into a holding pattern on the average active account revenue.*** And then as Phil mentioned because we have the compounding effect when you find it sort of in a holding pattern in the early quarters, it cumulates pretty quickly when you start to look three, four quarters out. So as we went through our planning cycle and came to sort of rationalization of that fact we felt it would be sensible to be able to basically communicate that externally.

\*\*\*\*

**Matt O'Brien**

Okay. So as you think about '17, the street was modeled about 60 million revenue. You're guiding the midpoint of about 43, so down 17 million. You're saying that the majority of that is really just these new accounts. You're not going to be adding as many. You're going to be focusing on going deeper next year first as you kind of refine your selling process. And then from there, then you'll start being more aggressive in terms of adding new accounts, not that you won't add some next year, but that's really the big reason for that massive delta between what we were modeling and what your data sheet said.

**Jim Mackaness**

Yes I'll rephrase a little bit to your point. We would still expect to have some incremental new accounts added for sure. We want to try and maintain the balanced approach. The key metric that your dealing on is taking that into account and continuing to focus on how to go deeper across the broad spectrum. ***At the moment we're anticipating that on average active account revenue would still be in this holding pattern. And that's that the key component. Once we can break out of the holding pattern then we're really going to start to be at a sort of say, okay, now we understand how to drive that across the whole into the installed base.*** (emphasis added).

21.    Defendants Sawyer and Mackaness were also questioned about the depth of focus per account and what strategies the Company employed to increase revenue in individual accounts. In pertinent part, Defendant Mackaness responded as follows:

CLASS ACTION COMPLAINT
10

**Jim Mackaness**

Yes, Rick. This is this is Jim. I'll take a first pass, and then Phil can answer. ***So, I know, completely understand. I think, again, part of what we've got is obviously the applicability of our products we use that we apply across a large range of both hospitals and specialties as you know. So what that means is there is quite a lot of noise still within the data.*** But as we continue to enlarge it and talking it through obviously with the sales force and the marketing team. We continue to be able to sort of get better clarity into the patents. So case and point, when a new account comes to us for example, they may buy just single disposables. They may buy disposables with some retractors, or they may buy a couple sets of retractors.

***So, you can get a very lumpy first order. When we look at the profile and we try and sort of start to determine the overall trend, we tend to find there is a little bit of a heavier first order. And then what happens is as the account sort of goes into its buying pattern it steps down in the subsequent quarter and starts to rebuilt.*** That can rebuild quite significantly to your point. Some of our more mature accounts for example we had one that started with a basically a 10,000 order when it came onto the books, and that's actually grown to over 75,000 on a quarterly basis over three years.

So, there's a great example of how we can penetrate into more doctors and more specialties. (emphasis added).

22.    Lastly, Defendant Sawyer was asked for an explanation on why purchases in individual accounts slowed in the third quarter as compared to the prior two quarters. The discussion, in pertinent part, is as follows:

**Ben Andrew**

Great. Thanks for taking the questions guys. And I think following on Rick's line of questioning, let me just ask it this way. When you see kind of that maturing account if you will, not the initial order, what are the reasons why the buying patterns slows? And I'll give you a list, and just maybe try to break it down if you can. And I know there's no such thing as a one-answer, but just as you think about it, is it administrative pushback against utilization? Is it lack of doc interest? Is it the lack of time in the seat for the rep in the hospital selling? Is it the product offering? And also you've got initiatives against all of these, but when you look at it, you know, 34 million go into 43 at the middle of the range is 26% percent growth. It's not a lot of incremental growth. So, it's clear. You know, and then obviously the questions are trying to get to that. But just talk

about those four components and why this is the right guidance, if you will.

**Philip Sawyer**

I would say - I would point to two things. I would say, first of all, ***when they first go into an account, they are selling capital plus disposable, and the capital is a one-time sale. So then when you go back the next quarter, you have to redo all that capital to get back to that ratio of your revenues with capital. So, accordingly, you are your next order is going to be lower because it doesn't have capital.***

23.     In accordance with the earnings release, the Company's 2017 full-year guidance was dramatically decreased from a projected $60 million to $43 million.

24.     Upon the release of the after-hours news on November 3, the price of Invuity common stock plunged more than $4 per share, or 44.86%, to close at $5.10 per share on November 4, 2016, on unusually high trading volume of more than 2.5 million shares trading, or nearly 24 times the average daily trading volume.

### NO SAFE HARBOR

25.     Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

26.     Invuity's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.   The Defendants are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Invuity who knew that the forward-

looking statements was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

27.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Invuity, their control over, and/or their associations with the Company which made them privy to confidential proprietary information concerning Invuity, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**

**FRAUD-ON-THE-MARKET DOCTRINE**

28.    At all relevant times, the market for Invuity's common stock was an efficient market for the following reasons, among others:

(a)    Invuity's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had more than 16.93 million shares outstanding as of November 1, 2016.  During the Class Period, on average, 82,487 shares of Invuity stock were

traded on a daily basis, demonstrating a very active and broad market for Invuity stock and permitting a very strong presumption of an efficient market;

(c)     as a regulated issuer, Invuity filed periodic public reports with the SEC;

(d)     Invuity regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Invuity was followed by many securities analysts who wrote reports that were distributed during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)     unexpected material news about Invuity was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

29.     As a result of the foregoing, the market for Invuity common stock promptly digested current information regarding Invuity from publicly available sources and reflected such information in Invuity's stock price.   Under these circumstances, all purchasers of Invuity common stock during the Class Period suffered similar injury through their purchase of Invuity common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

30.     During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Invuity's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

31.     By artificially inflating and manipulating Invuity's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed.  Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 3,

2016, causing Invuity's stock price to fall precipitously as the prior artificial inflation came out of the stock price.   As a result of their purchases of Invuity securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

32.     This is a class action on behalf of those who purchased or otherwise acquired Invuity common stock between July 19, 2016 and November 3, 2016, inclusive (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants.

33.     Class members are so numerous that joinder of them is impracticable.

34.     Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Invuity common stock; and (e) the extent of and appropriate measure of damages.

35.     Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendant

36.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

37.     Throughout the Class Period, Defendants Invuity and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Invuity common stock, had the ultimate authority for making, and knowingly or recklessly made,

materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

38.     During the Class Period, Invuity and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Invuity common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Invuity common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Invuity and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

39.     In addition to the duties of full disclosure imposed on Invuity and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Invuity's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

40.     Invuity and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

41.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Invuity common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Invuity common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Invuity and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Invuity stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

42.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Invuity and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Invuity shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

43.     By virtue of the foregoing, Invuity and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

### COUNT II

**For Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

44.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

45.     The Individual Defendants had control over Invuity and made the material false and misleading statements and omissions on behalf of Invuity within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The

Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

46.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

47.     By reason of such wrongful conduct, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

1

## JURY DEMAND

2

    Plaintiff demands a trial by jury.

3

4

Dated: February 27, 2017             **GLANCY PRONGAY & MURRAY LLP**

5

6

                By: *s/ Robert V. Prongay*
                Lionel Z. Glancy

7

                Robert V. Prongay
                Lesley F. Portnoy

8

                Charles H. Linehan

9

                1925 Century Park East, Suite 2100
                Los Angeles, CA 90067

10

                Telephone: (310) 201-9150
                Facsimile: (310) 201-9160

11

                Email: rprongay@glancylaw.com

12

                **HOLZER & HOLZER, LLC**

13

                Corey D. Holzer
                Marshall P. Dees

14

                Alexandria P. Rankin
                1200 Ashwood Parkway, Suite 410

15

                Atlanta, GA 30338
                Telephone: (770) 392-0090

16

                Facsimile: (770) 392-0029

17

                *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: A4C2AE50-59CC-4395-8FAB-7A1678EC465E

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| INTY | 6/21/2016 | 300 | 8.26 |
| | 7/11/2016 | 350 | 10.53 |
| | 7/27/2016 | 350 | 11.52 |
| | 10/18/2016 | 400 | 11.52 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| INTY | 7/6/2016 | 150 | 10.47 |
| | 7/8/2016 | 150 | 10.34 |
| | 7/21/2016 | 50 | 11.91 |
| | 7/21/2016 | 300 | 11.85 |
| | 8/23/2016 | 300 | 12.34 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

No

       Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____24____ day of ___February___, 2017 in __Fox River Grove__, ___Illinois___ .

                                                             City                State

(Signature) X_____ Mike Paciga _____

                                 B93236A0F778453...

(Print Name)_____ Mike Paciga _____

## SCHEDULE A

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
| --- | --- | --- | --- |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
| --- | --- | --- | --- |