**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
EX KANO S. SAMS II (#192936)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKE PACIGA, Individually and on Behalf of All Others Similarly Situated, | ) Case No. 4:17-cv-01005-JSW ) |
| | ) <u>CLASS ACTION</u> |
| Plaintiff, | ) |
| | ) **AMENDED COMPLAINT FOR** |
| vs. | ) **VIOLATION OF THE FEDERAL** |
| | ) **SECURITIES LAWS** |
| INVUITY, INC., PHILIP SAWYER and JAMES H. MACKANESS, | ) |
| | ) |
| | ) |
| Defendants. | ) **<u>DEMAND FOR A JURY TRIAL</u>** |
| | ) |

Lead Plaintiff Mike Paciga ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Invuity, Inc. ("Invuity" or the "Company"), as well as media and analyst reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and/or entities who purchased or acquired the common stock of Invuity between February 24, 2016 and November 3, 2016, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). The acts and transactions giving rise to the violations of law complained of occurred in this District, and Invuity's headquarters are located in this District.

## PARTIES

4.      Plaintiff Mike Paciga purchased Invuity common stock during the Class Period as

1  described in the certification previously filed and incorporated herein by reference, and suffered

2  damages as a result.

3      5.    Defendant Invuity is a California corporation with its principal executive offices

4  located in San Francisco, California. Invuity is a medical technology company that develops,

5  markets, and sells single-use and reusable medical technology for use by surgeons across the

6  United States.  The Company focuses on advanced photonics products that enable physicians to

7  have a better visualization of the surgical cavity when performing minimally-invasive and

8  minimal-access procedures.

9

10     6.    Defendant Philip Sawyer ("Sawyer") is, and was at all relevant times, the President

11  and Chief Executive Officer ("CEO") of Invuity and a member of its Board of Directors.

12     7.    Defendant James H. Mackaness ("Mackaness") is, and was at all relevant times, the

13  Chief Financial Officer ("CFO") of Invuity.

14     8.    Invuity, Sawyer, and Mackaness are referred to herein as "Defendants."

15  Defendants Sawyer and Mackaness are referred to herein as the "Individual Defendants."

16

17     9.    During the Class Period, the Individual Defendants served as Invuity's executive

18  management and oversaw the Company's operations and finances. The Individual Defendants

19  were intimately knowledgeable about all aspects of Invuity's financial and business operations.

20  They were also intimately involved in deciding which disclosures would be made by Invuity.  The

21  Individual Defendants made various public statements for Invuity during the Class Period, and

22  participated in Class Period analyst conferences.

23

24     10.   During the Class Period, the Individual Defendants, as senior executive officers

25  and/or directors of the Company, were privy to confidential and proprietary information

26  concerning the Company, its operations, finances, financial condition, and present and future

27  business prospects.  Additionally, as set forth more fully below, the Individual Defendants had

28

access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

11. The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

12. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

13. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by

the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

**BACKGROUND AND RELEVANT PRE-CLASS PERIOD STATEMENTS**

15.     Invuity is a commercial-stage, medical technology company founded in 2004 with the goal of improving a surgeon's visualization of the surgical cavity during open minimally-invasive and minimal-access procedures. Utilizing the Company's propriety Intelligent Photonics technology, Invuity provides surgeons with single-use and reusable illumination devices to improve intra-cavity visualization in the operating room.

16.     Invuity develops optical waveguides that shape and direct thermally cool light into the surgical cavity.  The Company markets its devices to surgeons, hospital group purchasing organizations, and integrated delivery networks through the Company's team of sales

1   representatives.  Invuity sells its devices within the United States predominately through this

2   direct sales force.

3       17.     During the Class Period, the Company generated revenue from the sale of its

4   disposable and reusable surgical devices and accessories.  Invuity integrates its Intelligent

5   Photonics technology within its proprietary optical Waveguides that shape and direct light and

6   manufactures customized surgical devices, which utilize Invuity's optical waveguides for

7   illumination. These devices include surgical retractors, handheld aspiration devices, and drop-in

8   intra-cavity illuminators.   The retractors are reusable, but require a new, single-use optical

9   waveguide for each procedure (a razor/razor blade model).  Both the handheld aspiration devices

10  and drop-in intra-cavity illuminators are single-use products.  Defendants claimed to generate the

11  majority of the Company's revenue from single-use products, whose sales mirror procedure

12  volumes.

13      18.     The Company described its business as seasonal.  Companies in the medical-device

14  field frequently experience seasonality in revenue numbers.  First quarter softness often results

15  from patients deferring elective procedures following the reset of patient health insurance

16  deductibles at the start of the year, as well as from facilities working through excess inventories

17  from the surge in procedure volume during the fourth quarter.  Demand tended to be the highest in

18  the fourth quarter, as patients were more inclined to undergo an elective procedure in order to

19  spend the remaining balance in their flexible-spending accounts, or because they reached their

20  deductible threshold.

21      19.     Since going public in June 2015, Invuity has never been profitable, despite steadily

22  growing revenue and sales.  Initially, Invuity's growth was grounded in its ability to open new

23  accounts.   Investors understood that Invuity's attempt to increase sales to active, existing

24  customers – as opposed to growing revenue through opening new accounts – was a more

1    sustainable, higher-value source of revenue that would allow Invuity to grow exponentially and

2    eventually become profitable.  Average revenue per account, therefore, was an important metric

3    for investors to evaluate the Company's success in the execution of its growth plan.

4           20.    Initially, Invuity's revenue growth potential was grounded in its ability to open new

5    accounts.  The Individual Defendants, however, frequently focused investors and the market on

6    Invuity's opportunity to grow revenue through "going deeper" into active customers – *i.e.*

7    expanding sales within customers who made purchases in products the previous quarter.

8           21.    On June 15, 2015, former CFO Michael Gandy ("Gandy") informed Invuity that he

9    would be tendering his resignation as soon as the Company found an appropriate replacement for

10   him.  On August 11, 2015, Gandy announced his resignation from Invuity effective August 23,

11   2015.  No explanation or reasoning was provided regarding why Gandy tendered his resignation at

12   that time.  Defendant Mackaness assumed the CFO position on August 24, 2015.

13          22.    In the quarters preceding the Class Period, the Individual Defendants described

14   Invuity's transition from a company dependent on new accounts for growth to one on the verge of

15   dramatic acceleration in revenue growth, driven by successfully going deeper into active accounts.

16   Investors were led to believe that Invuity's ability to increase its active account basis while

17   maintaining a steady average per account indicated that Invuity was achieving its plan to go

18   deeper into each account. This process, in turn, purportedly justified Invuity's stock trading at

19   higher earnings multiples, even before the Company turned a profit.

**Invuity Hosts Second Quarter 2015 Analyst Call**

          23.    On August 11, 2015, Invuity hosted an earnings conference call to discuss the

Company's second quarter 2015 financial results.  During the call, Invuity told investors the

Company was still growing through new accounts, but that over time, the focus was shifting.

Brett Robertson ("Robertson"), the Company's Chief Business Officer and General Counsel at the time, made the following statement:

> [We are] currently responding to incoming leads adopting a land grab approach to the marketplace by adding new hospital accounts, [and that] over time we will focus greater resources on driving deeper within each institution to capture additional surgeons, procedures and specialties.

24.    In response to an analyst question, Defendant Sawyer acknowledged the Company primarily focused on new accounts at the expense of expanding active accounts by maintaining a "land grab mentality" and emphasizing "just hunting rather than gathering at this point."

25.    During the August 11 call, Defendant Sawyer also stated that "over time as the land grab mentality starts to get a little more mature, and then we start going deeper in hospitals, you overall will start to see a higher proportion of hospitals using more than one product which gives us obviously going forward tremendous leverage."

**Invuity Hosts Third Quarter 2015 Analyst Call**

26.    On November 10, 2015, Invuity hosted an earnings conference call to discuss the Company's third quarter 2015 financial results.  Defendant Sawyer proclaimed Invuity was now "going deeper" into existing accounts.  In pertinent part, Defendant Sawyer stated as follows:

> [W]e've been increasingly successful in going deep within existing accounts by moving to additional surgeons specialties. Due to the success of this model, as well as a need to continue to focus on responding to new leads, *we're institutionalizing this model by hiring key account managers in metropolitan areas who will work with our reps and focus on going deep within current accounts*.

27.    Defendant Sawyer explained during the November 10 call that one of the Company's major plans was to go deeper into accounts.  For example, the Company's Hidden Scar Program was designed to certify and train surgeons on advanced, minimally-invasive and minimal-access surgical approaches that operate through smaller incisions with limited fields of vision.  Defendant Sawyer said Invuity's Hidden Scar Program for breast-reconstruction

procedures was expected to "drive increased penetration in [the Company's] hospital accounts" as part of a larger women's health initiative, claiming the initiative was a "top-down program" designed to "deliver optimal clinical and aesthetic results."

28.     Defendant Sawyer further explained during the November 10 call that "[i]n those accounts with multiple specialties and surgeons, revenue per account is many times what it is in accounts with one specialty."  Sawyer repeated that "[w]e will continue to focus on adding new accounts, but going forward in key metropolitan areas, we will add key account managers who will assist the reps in the territories [that] drive utilization in existing account[s]."  When pressed on the number of account managers Invuity expected to hire, Defendant Sawyer stated "we are currently optimizing the mix of how many we're going to add and we will, in earnest, be adding – starting to add them over the next couple of months and that will continue."

29.     Defendant Mackaness appeased concerns from analysts on the November 10 call, who asked whether the Company had seen any one-time benefits during the quarter.  For instance, an analyst from Piper Jaffray & Co ("Piper Jaffray") asked whether large, one-time purchases drove up the average revenue per account for the quarter, noting the Company claimed it generated $5.6 million by selling 16,000 cases of product in the third quarter, and just $5 million by selling 17,000 cases the quarter before.  Defendant Mackaness responded by saying:

> [Y]ou just always have to remember that *whenever we sell into an account, there's obviously the retractor and the consumables*, so I get where you're coming from with the math, but I think you're going to find that, depending on the mix with someone ordering in the retractors versus the things, it's always going to flex it a bit.

30.     Defendant Mackaness expressly confirmed that Invuity's growth was not supported by any one-time benefits, and that the Company was "not seeing any, sort of, notable trends that you're questions teeing up."  Instead, Defendant Mackaness explained that the Company was "pleased with the accretion of new accounts . . . [and] with our abilities, obviously, going deep."

31.     On February 23, 2016, the day before the Class Period begins, the Company's General Counsel (and former Chief Business Officer), Robertson, announced her resignation effective March 31, 2016.  Robertson agreed to continue her duties through the end of the first quarter of 2016.  No explanation or reasoning was provided regarding why Robertson tendered her resignation, despite her long tenure at the Company.

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

32.     The Class Period begins on February 24, 2016.  On that day, Invuity hosted an earnings conference call to discuss the Company's fourth quarter and year end 2015 financial results.  Defendant Sawyer declared that the positive results "established [the Company's] ability to execute against an aggressive growth model."   Defendant Sawyer described the value to investors of the Company's ability to go deeper into accounts by selling higher margin disposable products:

> *One of the special aspects of our business model today* is that a significant portion of our revenue stream currently about 80% generated by our single-use products that generated higher growth margin. This in turn provides significant value to the company and shareholders through the *predictability and profitability* of this type of business.

33.     Defendant Sawyer commented further on the quarter's results, telling investors:

> [W]e showed excellent progress and success in increasing our active account base and winning new accounts. . . . In addition, *we went deeper in existing accounts* and our total cumulative procedure volume increased to 145,000 up from 80,000 this time last year.

34.     Moreover, during the February 24 call, the Company provided investors revenue guidance for 2016, and stated Invuity expected 2016 revenues between $35 million and $37 million.  Defendant Mackaness stated: "we would expect to see seasonality in our business with the first quarter being the most difficult and the fourth quarter being the strongest."  Defendant Mackaness stated that he expected 40 percent of Invuity's revenue to be generated in the first half

of 2016, with the remainder to come in the second half.  Defendant Mackaness also noted that Invuity expected its cash burn to crest in the first quarter of 2016, and to improve the remainder of the year.

35.    Defendant Sawyer further assured investors that Invuity did not have excessive concentration in any of its large accounts, and as a result, the Company expected to see limitless revenue growth into the foreseeable future.  In pertinent part, Defendant Sawyer told investors:

> [W]e do have an array or large accounts not to the degree where there's too much concentration *but certainly to the degree of knowing that the business could really scale* additionally based on concentration and going deep and centered.
>
> *We don't really see any limit right now with respect to the equation of going deep into these hospitals.* We have had -- occasionally we've had questions from people wondering if for instance *how can they keep up the growth or has the growth started to taper up.*
>
> *Let me tell you and this is more than to your comments, we are just scratching the surface.*

36.    According to Mackaness, because of the increasing productivity of recently hired sales personnel, "we're very positive about how those new people continue to feed in and basically build that tenured rep base to be productive to *drive that revenue in the second half* [of 2016]."

37.    Rick Wise, an analyst from Stifel, Nicolaus & Company, Inc. ("Stifel"), engaged in the following exchange with the Individual Defendants on the February 24 conference call about the sustainability of the Company's average revenue per account:

> **Rick Wise**
>
> And just last to me, can you talk about the revenue per account? I may not be doing the math back to the outlook correctly but *it seems off modestly roughly flattish and it's just -- so it seems like the growth of the quarter is really driven by the new account.* Am I thinking about it correctly or do I have it wrong and maybe, Phil, just remind us about the deeper broader comments you've made in the past in how we need to think about it versus 2016. Thank you very much.

**Philip Sawyer**

Yes. You're welcome. I think we do need to discuss that with you *because we actually have been going deeper.* I'm going to let Jim give you the details here.

**Jim Mackaness**

Yes. I mean, Rick, as you said, *I think what you're seeing is a combination of the two* that you are seeing in the fourth quarter active account base which are picked up nicely. Obviously, it's driven a lot by new accounts coming in. So on the average account, we had had it really close to that 11,000 of the quarter which is sort of held up fairly consistent during the last couple of quarters.

So the challenges this day is the good news is when we draw in the new accounts, *that's great because we're going broader*, if you like, . . . *so keeping the average around [flat] is kind of ideal because we're kind of hitting on both [cylinders].*

38.     Despite its revenue growth, Invuity continued to lose money during the quarter. Analysts and investors alike were concerned with the Company's cash burn rate.   Richard Newitter ("Newitter"), an analyst for Leerink Partners LLC ("Leerink Partners"), had the following exchange regarding the Company's level of comfort with its cash position:

**Richard Newitter**

recently you presented at a healthcare conference and I think I'd asked you about mainly your cash position and your future cash needs and if I'm recalling correctly I do believe that *you said that you feel comfortable that your current cash position should sustain into the latter half of 2017*. I just want to check in with that comment and make sure I got it right and do you still feel comfortable with that?

**Jim Mackaness**

Yes. I think, Rich -- thanks for that. I think that's absolutely appropriate. Yes, *we had no immediate plans.* As we've mentioned in the call, anticipating with the investments we're making within the sales force with some new products, we're going to -- *and the seasonality of revenue*, we're looking to see the [burn], if you like, peak in this quarter and then mitigate going forward.

*And so we feel very comfortable with the way we are and we see basic, and to your point, sort of the in the backend of 2017 if that's -- depending on how we want to run the expenses going forward on the next sort of 18 to 24 months.*

**Philip Sawyer**

And the other element to bring up there with respect to flexibilities that current models call for, as you say, *cash comfortably lasting into the latter half of next year.* But the cash required after that is very modest and the company has several different avenues where we choose to raise more cash whether that be the equity markets or through corporate partnering or even debt.

39. During the February 24 call, Defendant Mackaness also summarized the Company's ability to achieve "exponential growth" by continuing to go deeper into existing accounts. In pertinent part, Defendant Mackaness stated as follows:

*I think the growth really is and it's one of the benefits we have is an element of being exponential.* So you get new reps into new territories, you've got new accounts go very deeper to existing accounts in the existing surgical specialties and then you get the opportunity [and the advantages] to go into new procedures. *So, it's just that compounding element of that to drive exponential growth.*

40. Defendant Mackaness concluded his comments on the February 24 call by discussing the favorable trend Invuity was seeing with existing customers expanding the number of products they ordered. Defendant Mackaness stated: "We are definitely seeing an increase in the installed base. . . purchasing multiple SKUs which we use as a proxy for going to models. So that trend is continuing in the right direction."

41. The statements contained in ¶¶32-40 were false and misleading and omitted material information. By this time, Defendants knew Invuity's revenue growth was limited by the finite number of specialties into which it could expand, and by its inability to sufficiently grow sales of its disposable products after an initial sale of retractors. As Defendants later admitted, initial sales to new customers, or first sales to new specialties within a customer, consisted largely of nonrecurring capital purchases with as little as 30% of the sale consisting of disposable

products.  This resulted in a step back in revenue for the second purchase as disposable sales did not offset the loss of the capital component from the first sale. This step back in revenue growth eliminated the compounding growth effect Defendants claimed to be as critical to Invuity's exponential revenue potential.

42.     Invuity's claim that it was successfully going "deeper into existing accounts" was also false.  According to a confidential witness, in February 2016, Defendant Sawyer and non-party VP of Sales Bob Gerberich ("Gerberich") implemented sales practices designed to artificially increase sales of disposable products, a critical part of "going deeper" into accounts. The plan involved offering undisclosed discounts on retractors – which Defendants would later refer to as the "metal" component of sales – to induce customers to purchase large quantities of disposable products that they did not immediately need.  This scheme allowed Defendants to temporarily mask Invuity's inability to grow its active account revenue organically.

43.     Defendants also issued misleading guidance that lacked a reasonable basis and misrepresented the sustainability of Invuity's cash position.  As Defendants would later admit, the Company's stated revenue guidance of $35 to $37 million depended on its ability to generate substantial revenue in the second half of 2016 that, as described above, was already known to be unobtainable.  The Company's ability to avoid raising cash was also dependent on sales growth in the second half of 2016 that was not obtainable due to a number of factors, including the fact that: 1) the Company's growth was concentrated in non-elective surgeries, such as those related to breast cancer, which experienced less seasonality than other surgical fields; 2) revenue in existing accounts declined after the initial order in a specialty because follow-up sales consisted primarily of disposable products, whereas the initial purchase included a large, nonrecurring capital component; and 3) Invuity's revenue growth model depended on assumptions that overstated the Company's ability to grow active account revenue.

44.     On March 25, 2016, Invuity filed its Form 10-K for the year ended December 31, 2015.  Defendants discussed Invuity's increased revenue for the year, attributing the gain to the growth of the Company's sales and marketing infrastructure, as well as the Company's continued efforts in research and development.  The filing was approved and signed by Defendants Sawyer and Mackaness.

**Invuity Hosts First Quarter 2016 Analyst Call**

45.     On May 5, 2016, Invuity announced its first quarter 2016 financial results for the reporting period ended March 31, 2016.  The Company filed its first quarter 2016 Form 10-Q with the SEC and reported a 44% increase in revenue, a 6% increase in gross margin, and 33% increase in purchases of Invuity devices and products, as compared to the first quarter in 2015.

46.     During the May 5 earnings conference call with analysts, Defendant Sawyer lauded the Company's continued revenue generation and focus on growth within mature active accounts, stating in pertinent part as follows:

> We're very pleased with our commercial and operational execution in the first quarter. Revenues in quarter of 2016 grew by 44% [year]-over-year to $6.4 million. We continue to generate about 80% of revenue from our single-use products that produce high growth margins. We had approximately 545 active accounts in Q1 compared to 410 in Q1 2015. Total cumulative procedural volumes increased to approximately 162,000, up from 92,000 this time last year. We ended the quarter with 67 sales reps, achieving our stated goal of ending Q1 with reps in the high 60s.

> We have great momentum and have now posted four quarters of strong execution as a public company.

47.     Defendant Sawyer also described how Invuity's Hidden Scar Program was driving an increase in disposable sales, noting: "[A hospital in Florida's] disposable unit volume has tripled since adopting Hidden Scar from 100 per quarter to more than 300 units within two quarters."  Defendant Sawyer later added: "[f]or the balance of 2016, we're focused on execution.

We'll continue to implement programs to . . . such as Hidden Scar . . . to drive new account growth and deeper penetration within existing accounts."

48.     During the same conference call, Defendant Mackaness reiterated Defendant Sawyer's positive outlook for the Company, stating in pertinent part as follows:

> As for our forward outlook, we continue to expect revenue for 2016 in the range of $35 million to $37 million. **We continue to expect to see slightly less than 40% of our revenue occurring in the first half of the year with the balance in the second half** based on seasonality in the recent ramp in the sales force.

49.     Defendant Mackaness also explained on the May 5 call that the Company's cash position was strong, stating: "we anticipated that our cash burn would peak in the first quarter" while claiming they had "confidence in how we are managing our capital resources."  Newitter, an analyst from Leerink Partners, followed up on this point later in the call when he asked: "I just want to make sure you still continue to feel confident in the Company's cash position and when do you think you are good to go before you need to kind of tap into financial markets to do any kind of raise?"  Defendant Mackaness responded:

> **Yes**, I think, **we're performing exactly as we had it planned and modeled.** We continue to see the operating leverage play out for the rest this year. And I think as we previously mentioned, **we feel comfortable we have cash into the latter half of 2017.**

50.     During the Question and Answer portion of the conference call, Defendant Mackaness fielded another question from Rick Wise from Stifel exposing the disconnect between Invuity's public earnings guidance and analysts' financial models based on the information the Company was reporting.  The exchange proceeded as follows:

> **Rick Wise**
>
> [M]y summary question to you, both, is you guided us for 2016 to $35 million, $37 million as you have -- I think I'm correct in saying in every quarter since you've been public. You once again exceeded consensus projection. So when I think about the $35 million to $37 million increasing number of reps, productivity going well, second

quarter starting well, do you want to update us on the $35 million to $37 million at the very least? ***It would feel like you'd be comfortable with the -- more at the upper end of that range.***

**Jim Mackaness**

Rick, I'm going to take a swing on this one. I'm sticking with the $35 million to $37 million.

**Rick Wise**

And I appreciate your -- ***your succinct comment there. But, Jim, can you help us understand why the measured -- given these trends of why you're -- is there anything ahead that might make you stay where you are*** other than just prudence and -- sort of good old-fashioned conservatism?

**Jim Mackaness**

I'll go with the prudence and conservative approach, if you like, with where we are. ***We like the momentum, we like the trajectory, we think we're executing on the plan and we look forward to sort of, you know, basically being in the $35 million to $37 million range.***

51.    The statements contained in ¶¶45-50 were false and misleading and omitted material information for the reasons described in ¶¶41-44.  The statements contained in ¶¶45-50 were also misleading because the success Defendant Sawyer touted for the "Hidden Scar Program" was not representative of its normal account buying pattern in which the Company received a large initial purchase that was followed by smaller subsequent orders.  As Defendants would later admit, sales were not going as planned.  Revenue from an initial order was dominated by the sale of capital; the sales force was not incentivized to pursue the necessary follow up with active accounts to ensure the continued use of disposable products after the initial purchase; and the Company was employing sales practices to artificially inflate sales of disposable products.

52.    On May 5, 2016, Defendants reported in Invuity's Form 10-K filing with the SEC that Vice President of Marketing, Susan Martin ("Martin"), resigned from the Company effective April 19, 2016.  No reason or explanation was given for Martin's sudden departure.  Prior to the

10-K, no other filing or press release announced Martin's resignation.  In April 2016, Joe Guido, the Company's current Vice President of Business Development, assumed Martin's role.

53.     On May 18, 2016, the price of Invuity stock reached a Class Period low of $4.82, and then began a steady climb upward driven by Defendants' false and misleading statements regarding the Company's successful execution of its plan to drive deeper into existing accounts and expectations of substantial second-half revenue growth.

54.     On June 22, 2016, Newitter of Leerink Partners issued a report entitled "Mgmt Mtgs Highlight Robust Growth & New Product Outlook."   In the report, Newitter reported Defendants' private confidence in the Company's execution of its growth plan, stating in pertinent part as follows:

> **Management Meetings Highlight Strong Growth Outlook & New Products Still Ahead**
>
> ***We recently hosted investor meetings with IVTY CEO Philip Sawyer and CFO Jim Mackaness.*** We came away from the day's discussions reinforced in our view that ***key drivers are in place to sustain a 60%+ revenue [compound annual growth rate]*** over the 2015-18E period--at the higher end vs. small-cap peers--as IVTY drives adoption of its proprietary Intelligent Photonics technology across a variety of surgery areas representing an aggregate potential ~$2B total mkt opportunity. Reiterate OP & $15 PT.
>
> The company sees productivity being driven by: (1) a larger pool of customers; (2) deeper penetration across hospitals in multiple specialties; and (3) an incentive structure that rewards both existing account reorders and new account openings.
>
> Mgmt believes that SG&A leverage should begin to be more apparent in 2H16 and into 2017 as a bolus of rep hires in 2H15 into 1H16 mature and see rising levels of productivity.

55.     On July 1, 2016, despite express statements on May 5, 2016 that Invuity's anticipated second-half revenue would be sufficient to maintain stability in its cash position through the end 2017, and that Defendants had no plans to raise cash through an equity sale or otherwise, the Company filed for a mixed shelf offering of up to $100 million.   The Company

also filed a draft prospectus indicating its intent to conduct an "At-the-market" offering for up to

$25 million worth of stock.

56.    On July 19, 2016, Invuity announced its second quarter 2016 financial results for

the reporting period ended June 30, 2016.   In the earnings release, Defendant Sawyer praised

Invuity's expansion across procedures within active accounts, stating in pertinent part as follows:

> We had a strong second quarter highlighted by 73 percent revenue
> growth and *continued execution on our development plans to*
> *expand our advanced photonics technology to additional*
> *complementary surgical procedures and modalities[.]* We are
> pleased with our progress to date and excited about our momentum
> towards the widespread adoption of our unique devices and
> technologies, which provide meaningful clinical and economic value
> to surgeons and hospitals.

57.    After the markets closed on July 19, 2016, Defendants conducted a conference call

with analysts.   During the call, Defendant Sawyer emphasized the Company's confidence that it

could continue to expand to additional specialties within active accounts while adding new

customers and maintain a consistent average revenue per account.   In pertinent part, Defendant

Sawyer stated:

> [W]e continue to generate about 80% of revenue from our single-use
> products that produce high gross margins. . . . *In the quarter, we*
> *saw significant progress in both the expansion of our active*
> *accounts, as well as an increase in revenue per account.* We had
> approximately 610 active accounts, a 37% increase over the 445
> active accounts in Q2 2015 and a sequential increase of 12% over
> the 545 accounts from last quarter.
>
> *Revenue per account was $12,500 in the quarter, an increase*
> *from $10,400 in Q2 2015, demonstrating our ability to go deeper*
> *in each account.* We remain highly focused on both continuing to
> add accounts, as well as expanding our utilization within our
> current active accounts.
>
> *We continue to see evidence that once we have a foothold in an*
> *account that we can be successful in expanding the number of*
> *specialties that use our products.* Overall, we are executing well
> and building strong commercial momentum.

58.     Defendant Mackaness echoed Defendant Sawyer's enthusiasm and further emphasized the importance of adding new accounts while continuing to grow revenue per active account, stating in pertinent part as follows:

> Invuity posted strong results in the second quarter of 2016. Revenue was $8.2 million, a 73% increase over last year's second quarter of $4.7 million and a 28% increase sequentially over the $6.4 million reported for Q1 2016 ***driven by an increase in active accounts and growth in revenue per active account.***

59.     During the Question and Answer portion of the conference call, Defendant Mackaness spoke about the Company's across-the-board growth in revenue per account.  In pertinent part, the exchange proceeded as follows:

> **Matthew O'Brien**
>
> Okay, so when we back that out, your product revenue in the quarter, about $7.7 million, quite good sequentially. ***Clearly, a very strong improvement in the number of accounts, but more importantly the revenue per account.*** Can you just talk a little bit about if that's a broad-based improvement that you are seeing across multiple procedural areas, or is that really contained to breast or some other area that's driving a majority of that growth? And how should we speak about that type of performance going forward?
>
> **Jim Mackaness**
>
> Yes, ***we would classify it as broad-based***. As you know, it can be a little bit more qualitative than quantitative on tracking our products to the actual procedures, but we did do a synergy check with the sales channel and they felt that the percentage sold across the disciplines remained constant, ***so I'd say it was a broad-based penetration***. ***I do think it's worth noting that it was impressive to have that number, as well as the significant tickup in active accounts, so firing on both cylinders there for this quarter***.

60.     Defendants Sawyer and Mackaness addressed several questions from analysts during the July 19 conference call concerning the Company's productivity growth and the risk of flatlining in older customer accounts.  In responding to a question about the process of

obtaining approval from Value Analysis Committees at hospitals, Defendant Sawyer made the following statement:

> [A]s we just noted, ***we are going deeper in the hospitals***, and when you go deeper, you are able to move either -- sometimes you have no more mandatory need to go through Value Analysis Committee, and then sometimes it's quicker. And so that has definitely helped to compress the overall time tables, and also the reps that we are hiring have increasingly been strong, which has also helped.

61. Defendant Sawyer also emphasized the Company's success in growing salesperson productivity, stating:

> Yes, we definitely think upon it multiple axes, multiple ways that we can continue to build that productivity in the territory. So for sure obviously new accounts, a lot of opportunity to continue to penetrate, as I said, into additional hospitals. Also going deeper into the hospitals, ***which we showed this quarter with the active account revenue growing, so that's there.*** Talking about things like for example now accessing gynecology within existing sites gives us that incremental ability to go deeper. ***So that's always been part of the strategy that continues to play out.***

62. When asked by an analyst whether Defendants had seen any "plateauing" in the Company's mature accounts, Defendant Sawyer was unequivocal in saying:

> ***We have not seen plateauing.*** We've been very encouraged by the -- at our smaller stage of company, the ***seemingly open-ended opportunity available to us to go deep in hospitals*** because when you think about it, we first penetrate the hospitals through on average somewhere between two and three surgeons, and then you have an opportunity to go to more surgeons, to then go to more specialties. This is all with one or two products. Then you have an opportunity to sell additional products into the hospital and ***you can see how you could have easily a 5 to 10 times multiplier from when you first get into a hospital to how the business really develops over time***.

63. Defendant Mackaness also elaborated on the successful ramp-up of the sales force in the following exchange with Raymond Myers, an analyst with the Benchmark Company, LLC ("Benchmark"):

**Raymond Myers**

So what I'm getting at is, as the reps are becoming more experienced because in the past we talked about the reps -- you had hired a large bolus of reps in the last nine months, and those reps are getting more experience. *So as that occurs, are they increasing the sales? Are they developing in the way that you would have expected, or are there any surprises?*

**Jim Mackaness**

*So far, it's really going according to plan, which is excellent.* Obviously -- and we've made commentary to this and you are pointing it out as well, Ray -- we went through a lot of the organizational movements in 2015, which allowed us to start 2016 with a pretty stable plan, stable territory map, allowing the reps to really get their feet underneath them and that was coincident obviously as you said with the timing and the maturation. *So it's really all moving according to plan at this stage.*

64.   Defendant Mackaness reaffirmed the Company's revenue guidance for 2016 of $35 million to $37 million.

65.   The statements in ¶¶54-63 were false and misleading and omitted material information. Specifically, Defendants knew, but failed to disclose, that active accounts moved through a maturation cycle whereby revenue declined substantially after an initial purchase, either by a new customer or within a new specialty at an existing customer, and the continued increase in active accounts made it difficult to significantly increase the average revenue per account.  As Defendants would later admit, initial purchases accounted for 30% to 35% of a customers' annual revenue and nonrecurring capital purchases made between 50% and 70% of the initial sale.  After an initial sale, subsequent sales stepped down in revenue because the capital component was reduced or eliminated, and the sale of disposable products did not offset the capital loss – which meant Invuity could not obtain the exponential growth it was depending on to provide cash and eventually to make the Company profitable.

66.     The statements above were also false and misleading because Invuity was able to temporarily mask the fact that the Company's sales of disposable products were not growing fast enough to counterbalance the accretion of new accounts by capturing nonrecurring revenue in from initial purchases and offering incentives for customers to purchase disposables.  According to a former employee, Defendant Sawyer and non-party Vice Present of Sales Gerberich implemented a plan to artificially inflate the sales of disposables by giving away retractors (or offering two for the price of one) to customers in exchange for large purchases of disposables. This scheme further allowed the Company to hide its dependence on the initial sale of capital products to produce growth and maintain stable revenue per account numbers.

67.     Defendants further misrepresented the impact of seasonality on the Company's revenue growth, and falsely claimed the Company was experiencing broad growth throughout all divisions.  As Defendants would later admit, "most of [Invuity's] growth" was derived from its breast division.  Defendant Sawyer would further explain that, because most breast surgeries are non-elective, the Company did not benefit from the seasonal boost to procedures experienced by its smaller spine and orthopedic divisions.  The expansion of the breast business was driven in large part by the Company's Hidden Scar Program, in which Defendant Sawyer played a personal role in developing and marketing.   Defendants would also later claim that the Company's large range of hospitals and specialties created "noise" within the sales data that undermined Defendants' ability to understand the Company's operations.   The accounts of confidential witnesses, as more fully described below in ¶¶140-157, also corroborate that these statements were knowingly false and misleading at the time they were made.

68.     As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects, including its 2016 earnings forecast, were false and misleading and/or lacked a reasonable basis at the time the statements were made.

69.     On July 19, 2016, Piper Jaffray issued a report on the Company entitled "Another Strong Quarter; Going Deeper While Rapidly Expanding Its Client Base," stating in pertinent part as follows:

> This evening, Invuity announced Q2 numbers that beat expectations on the top- and bottom lines. Importantly, the number of ordering accounts rose significantly during Q2 and, at the same time, sales per existing account increased roughly 15% sequentially, which is the best performance from this metric since IVTY went public five quarters ago. . . . Simply put, the IVTY story is developing quite nicely and we believe investors should add to positions in this compelling technology provider.
>
> **Sequential Acceleration in Sales per Existing Account Even as the Number of Customers Rose at a Record Pace.** The most impressive metrics in Q2, in our view, was the revenue per account ending the quarter rose to nearly $13k (a 15% sequential improvement), even as the company absorbed a record increase in the number of ordering accounts (65 more customer in Q2 up to 610). We believe the combination of going deeper within existing accounts and expanding its customer base considerably will yield strong top-line growth in the coming quarters and years.

70.     On July 20, 2016, the Company filed its second quarter Form 10-Q with the SEC and reported a 73% increase in revenue, a 13.6% increase in gross margin, and 37.1% increase in purchases of Invuity devices and products, as compared to the second quarter in 2015.  Defendants again announced an increase in the Company's sales force and an intention to continue to grow the direct sales force and marketing departments so as to continue to further penetrate and develop the market for Invuity's products.  The filing was approved and signed by Defendants Sawyer and Mackaness.

71.     On July 20, 2016, Newitter of Leerink Partners issued another report on Invuity entitled "Solid 2Q Highlighted By +70% Rev Growth And GM Beat," stating "Bottom Line: IVTY's 2Q *performance increases our confidence key drivers are in place to sustain* a 60%+ '15-18E rev [compound average growth rate] . . . . Reiterate OP & $15 PT."

72.     In response to the Q2 2016 results, the Company's stock price rose significantly. Invuity stock price closed at $9.66 per share on July 19, 2016.  Defendants then conducted a conference call with analysts, and the stock closed up the next four consecutive days before reaching an intra-day high of $12.31 on July 25, 2016.  The stock continued to trade above its July 19, 2016 closing price, and reached a Class Period high of $14.25 per share on September 2, 2016. The price of Invuity stock was artificially inflated by Defendants' false and misleading statements until November 3, 2016, when Defendants began to reveal the falsity of the Company's growth narrative.

**The Individual Defendants Took Advantage of Invuity's Artificially Inflated Stock Price**

73.     On July 28, 2016, shortly after Defendants issued the false and misleading statements described above, Invuity set the price for previously disclosed secondary public offering of shares of its common stock.  The announcement stated as follows:

> Invuity [] priced its public offering of 2,800,000 shares of its common stock a price of USD10 per share, to raise gross proceeds of USD28 million In addition, the company granted the underwriters a 30-day option to purchase up to 420,000 additional shares of its common stock, to cover over-allotments, if any. The company expects to receive net proceeds of will be approximately USD25.9 million or USD29.9 million if the underwriters exercise in full their option to purchase additional shares, after deducting underwriting discounts and commissions and estimated offering expenses payable.
>
> ***The company intends to use the proceeds for (i) the continued expansion of its sales and marketing activities, (ii) investments in R&D, (iii) potential acquisitions or investments in complementary products, technologies or businesses, and (iv) working capital and other general corporate purposes.*** It intend to invest the proceeds in short-term, interest bearing, investment-grade securities, certificates of deposit or government securities.
>
> Piper Jaffray & Co. and Leerink Partners LLC are acting as joint book-running managers; William Blair & Company, L.L.C. is acting as co-manager; while Wilson Sonsini Goodrich & Rosati, is acting as legal advisor to the company for the offering.

> The offering is expected to be completed on or about August 2, 2016, subject to market and other conditions.

74.    Invuity also filed a Prospectus Supplement with the SEC on July 28, 2016 (the "Prospectus"), which supplemented the previously-issued prospectus dated July 21, 2016.

75.    On August 3, 2016, Invuity completed its public offering of 3.22 million shares of its common stock, including the underwriters over allotment option to purchase 420,000 shares at a price of $10 per share for gross proceeds of $32.3 million.

76.    Despite the dilutive effect of the secondary offering, Invuity's stock price continued to climb.

77.    On August 24, 2016, Defendant Sawyer exercised 42,000 vested stock options and sold the lot for an average price of about $13.03, resulting in proceeds of $547,142.40.  On the same day, Gerberich, Invuity's Vice President of Sales at the time, sold 10,500 shares for an average price of about $12.53 for total proceeds of $131,559.75.

78.    On September 1, 2016, Defendant Sawyer again exercised options and sold 6,000 additional shares at an average price of about $13.60 for total proceeds of $81,628.80.  Gerberich followed Sawyer's lead again and sold 1,500 shares for an average price of about $13.64, generating proceeds of $20,461.20.

79.    On September 19, 2016, Bruce Jackson of Lake Street Capital Markets issued a report on Invuity entitled "A Bright Idea For Better Surgical Illumination; Initiating Coverage With A BUY Rating And $18 Price Target," stating in pertinent part as follows:

> We are initiating coverage of Invuity with a BUY rating and $18PT, which is 5x our 2017 revenue estimate of $57 million. Given the company's high gross margins (71% in H1 2016 and rising) and expected 2016 revenue growth of more than 65%, we think shares deserve a premium valuation compared to the comp group. We use a revenue multiple because the company is not yet profitable but, estimate Invuity could achieve profitability in 2018.

80.     On September 22, 2016, Craig-Hallum Capital Group ("Craig-Hallum") issued a report on the Company entitled "Highlights from Management Meetings," stating in pertinent part as follows:

**OUR CALL**

*We recently traveled with CEO Phil Sawyer and CFO Jim Mackaness and came away with increased confidence in the near-term and long-term opportunities for the company.* We believe this stock should not be trading at a ~50% discount to the peer group and we reiterate our Buy rating.

81.     The price of Invuity stock continued to soar following the positive press that cited the Individual Defendants' confidence from Sawyer and Mackaness in Invuity's operations. Meanwhile, Defendant Sawyer and non-party Gerberich continued to unload their personally held shares.

82.     On October 3, 2016, Defendants Sawyer sold 5,100 shares at an average price of about $13.16 per share, and on October 6, 2016, he sold another 900 shares for an average price of about $13.01, producing combined proceeds of $78,828.96.  Gerberich likewise sold shares on October 6, 2016, selling 1,500 more shares for an average price of about $12.72 each which produced proceeds of $19,075.05.

83.     During the quarter, the two executives combined to sell 67,500 shares for total proceeds of $878,696.16.  Neither Defendant Sawyer nor non-party Gerberich had sold any shares before the quarter dating back to the Company's June 2015 initial public offering.

**THE TRUTH IS REVEALED**

84.     On November 3, 2016, Invuity filed its third quarter 2016 Form 10-Q with the SEC.  Defendants reported a decrease in the Company's direct sales force, while continuing to reiterate the intent to increase the direct sales force to further penetrate the market.

85.     On November 3, 2016, after the close of trading, Invuity reported its third quarter 2016 earnings for the period ended September 30, 2016.  In the conference call discussing the results, Defendant Sawyer stated as follows:

> Revenues in the third quarter of 2016 grew by 52% over last year's first quarter to $8.5 million and we continue to generate about 80% of revenue from single use products that have high gross margins.
>
> Total cumulative procedural volume increased to approximately 212,000, up from 125,000 this time last year. We had approximately 700 active accounts in Q3, up 51% from 465 in Q3 2015 and sequentially up 15% from 610 last quarter.

86.     During the November 3 conference call with analysts, Defendant Sawyer explained how lower revenue per active account had hampered the Company's prospects.  In pertinent part, Defendant Sawyer stated as follows:

> Although our revenue growth this quarter was strong at 52%, it was lower than expected. *The primary reason for the shortfall was lower revenue per active account than anticipated*. While we saw a significant and encouraging increase in accounts this quarter, *revenue per account declined sequentially from 12,500 in Q2 to 11,500 in Q3*. While a [percentage] of this decline was likely related to the impact of lower overall procedural volumes due to seasonality.
>
> *I would also note that the continued increase in active accounts has made it difficult to significantly increase the average revenue per account.*

87.     Defendant Sawyer further explained that the growth in sales in the Company's active accounts failed to keep up with growth generated by new accounts, saying:

> While we expect to see sequential revenue growth in the fourth quarter, *we're only forecasting a modest improvement in average revenue per account* in the quarter as *the ongoing increase in our base of active accounts is anticipated to largely offset expected procedural volume gains in the quarter.*

88.     Defendant Sawyer explained the cascading effect of the Company's inability to ramp sales in its active accounts, stating: "Based on this expectation, we're reducing our 2016

1   revenue guidance to a range of $32 million to $32.5 million, which represents approximately 50%

2   growth over the last year."

3       89.   In the same call, Defendant Mackaness discussed the financial impact of the

4   Company's inability to grow its active account revenue and its dependence on new account

5   openings for growth:

6

7           Third quarter 2016 revenue was $8.5 million, a 52% increase over
            last year's third quarter, *driven primarily by an increase in active*
8           *accounts*, which grew from 465 this time last year to approximately
            700 by the end of this quarter.

9

10      90.   Expenses and cash utilization remained in line with expectations, as Defendant

11  Mackaness explained:

12          Total operating expenses in the third quarter were $14.6 million, up
            from $12.2 million from Q3 2015 but *lower than $15.8 million last*
13          *quarter*.

14          Net loss for the quarter was $8.8 million or a loss of $0.56 per share.
            During the quarter, we used $7.4 million in cash, a decrease from
15          $8.4 million of cash used in the second quarter and *continues the*
            *trend of reducing our cash burn from a high point of $12.4 million*
16          *consumed in Q1 of this year*.

17

18      91.   Defendant Mackaness also noted that while the Company expected fourth quarter

19  numbers to reflect seasonal improvement, Invuity's 2017 forecast called for dramatically slowing

20  growth:

21          For 2017, we are introducing revenue guidance of $42 million to
            $44 million, *which represents growth of approximately 30% to*
22          *35% over the midpoint of our 2016 guidance*.

23      92.   Analysts were shocked by the forecast, and had a difficult time understanding

24  Defendants' excuses.   Defendants Sawyer fielded questions from analysts regarding the

25  Company's surprisingly low quarterly revenue and disappointing inability to drive deeper

26  penetration into its existing accounts.   Despite being given a list of potential reasons for the

27

28  Company's failure to drive deeper into existing accounts, Defendant Sawyer explained that

nothing had changed with its products or sales force.  Instead, Defendant Sawyer offered an implausible explanation that certain buying trends had only become clear at the end of the quarter, which caused Defendants to lower Invuity's expectations going forward.  In pertinent part, the exchange went as follows:

**Richard Newitter**

I'd like to just start with the outlook production. I just want to make sure I'm fully understanding kind of what's driving or what's changed really kind of since last quarter to this quarter. And I appreciate maybe there's some incremental seasonality, but, you know, *you were still trending at a 50% rate in the third quarter. You still expect a 50% growth rate in the fourth quarter. Can you just talk a little bit specifically about what's stopping you from getting deeper, or what stopped the momentum that you were seeing presumably up until the third quarter to drive that depth?* Is it a particular procedure that is harder to do? Is there something that's going on at the hospital level where driving adoption is -- or getting through the value committees is tougher? Can you can you elaborate a little bit there?

**Philip Sawyer**

So at the very end of Q3 we were surprised that we weren't closing the quarter at higher sales volume and into the early part of Q4. And despite the fact that we were bringing on many new accounts we were lower in Q3. So, this is towards the very end of the quarter than we thought we were going to end up. And we've been adding so many accounts as you saw in the numbers over the past year and even this past quarter when we kept grabbing the numbers and trying to look for trends what we saw is that the base of accounts, the utilization of those accounts on a quarterly basis was creating at a rate slower than we anticipated.

And as you saw, we announced the quarter before a higher overall utilization rate approximately 12-1/2. And what we increasingly came to understand through looking at all the numbers and we have we have accounts that have many different buying patterns. *And as we got more and more accounts the trend became clearer as we've been looking at the last series of weeks that are creating so many new customers is great for the top line, but it also has its challenges because they tend to order more in the first order, and then they drop to a level rate in the next order, which then has to build up over time.*

And if you think of our business as a line that compounds over time, if you remove that compounding - and first of all the accretion adds over a couple quarters and then add the compounding that ripples through our installed base to result in lower numbers. And so it was looking at the trends now in the clearest current fashion that led us to want to have at least that clarity that we saw given what we looking at now to the outside world.

93.    In sum, Defendant Sawyer explained that Invuity was not generating as much revenue from its active accounts as Defendants claimed to have expected because the Company failed to grow sales of disposable products at a sufficient rate to make up for the large capital component of initial purchases.  Defendant Sawyer's claim that this trend did not become apparent until the end of the third quarter is undermined, however, by Defendants' further description of the Company's inability to maintain or grow average revenue per account while expanding its active account base.

94.    Also on the November 3 call, Defendant Mackaness was pressed on the dramatic decline in revenue per account and the large, unexpected reduction in 2017 guidance.  In pertinent part, Defendant Mackaness stated as follows:

**Matt O'Brien**

I'm still not quite sure I understand what it is on an account basis that seems to have slowed here. I can understand Q3, but ***the outlook really calls for a pretty dramatic slowing on a per account basis.*** So, it would seem to me with the numbers that you're providing for next year being dramatically below the street, that ***there's something more fundamentally happening here beyond just the pace at which we're adding accounts.*** So, is there anything else you can -- you can detail as far as what may be going on there?

**Jim Mackaness**

I think definitely what we've seen is if you look at the active account revenues you saw an increment up through the end of Q2. And then to your point, we obviously saw it step down in Q3. And where went in and started analyzing and talk it over the sales force and continued to really sift through the trends, you know, what we've seen is we've seen that growing active account base which is great - the new accounts coming in. ***The new accounts, as Phil mentioned,***

*do have a diluted effect in the early stages. They move through a maturation cycle. So, as we put more new accounts in it kind of pulls that average down.* We do see success in going deeper in certain accounts *but at this stage we've not really been able to see that deeper going across all of the active accounts as we kind of anticipated.*

So, it's that is the rate of being of being able to get all of the other active accounts to behave like our leading cohort if you like and basically getting deeper...*We've kind of got ourselves into a holding pattern on the average active account revenue.*

95.    In fact, Defendant Mackaness explained that the Company's sales execution in 2017 would focus on going deeper into active accounts, which it had neglected to do before.  In pertinent part, the exchange between Matt O'Brien and Defendant Mackaness continued as follows:

**Jim Mackaness**

And that's why, as Phil has mentioned, *there's a lot of effort and focus now on having the specific programs and perhaps the clinical app people as well to really unlock that and be able to get that going deeper trend to occur across the whole installed base to able to drive that average active account revenue north.* We've kind of got ourselves into a holding pattern on the average active account revenue, and then as Phil mentioned, because we have the compounding effect *when you find it sort of in a holding pattern in the early quarters, it cumulates pretty quickly when you start to look three, four quarters out.*

**Matt O'Brien**

Okay. So as you think about '17, *the street was modeled about 60 million revenue. You're guiding the midpoint of about 43, so down 17 million.* You're saying that the majority of that is really just these new accounts. You're not going to be adding as many. *You're going to be focusing on going deeper next year first* as you kind of refine your selling process. And then from there, then you'll start being more aggressive in terms of adding new accounts, not that you won't add some next year, but *that's really the big reason for that massive delta between what we were modeling and what your data sheet said.*

**Jim Mackaness**

*Yes* I'll rephrase a little bit to your point. We would still expect to have some incremental new accounts added for sure. We want to try and maintain the balanced approach. The key metric that you're dealing on is taking that into account and continuing to focus on how to go deeper across the broad spectrum. At the moment we're anticipating that on average active account revenue would still be in this holding pattern. And that's that the key component. *Once we can break out of the holding pattern then we're really going to start to be at a sort of say, okay, now we understand how to drive that across the whole into the installed base.*

96.     Defendant Sawyer added: "And while we're going deeper in terms of making progress, the addition of so many new accounts this past quarter made it clear to us that *we weren't going deep fast enough to counterbalance the accretion of so many new accounts*."

97.     In an effort to further clarify the Company's "startling" downside guidance, analyst Rick Wise inquired as follows:

I mean I think *I'm hearing you say that just the math of opening up a lot of new accounts that you don't get the sales per account that the math of that obscures maybe progress elsewhere*…Can you talk about the number -- the percentage of accounts where your go deep focus is working and the kind of growth you're seeing there so that we could sort of extrapolate from that as these -- as the other accounts mature how growth could evolve going forward. You see what I'm getting at?

98.     In response, Defendant Mackaness stated as follows:

I think, again, part of what we've got is obviously the applicability of our products we use that we apply across a large range of both hospitals and specialties as you know. *So what that means is there is quite a lot of noise still within the data.* But as we continue to enlarge it and talking it through obviously with the sales force and the marketing team. We continue to be able to sort of get better clarity into the patterns. So case and point, when a new account comes to us for example, they may buy just single disposables. They may buy disposables with some retractors, or they may buy a couple sets of retractors.

*So, you can get a very lumpy first order.* When we look at the profile and we try and sort of start to determine the overall trend, *we tend to find there is a little bit of a heavier first order. And then*

1

2

> *what happens is as the account sort of goes into its buying pattern it steps down in the subsequent quarter and starts to rebuild.*

99.   After Defendant Mackaness, Defendant Sawyer again summarized the problem:

3

4

5

6

7

8

> And I would add, if you do take out the first orders and look at our then base business without that first order, over time, you do see a nice steady increase on a yearly basis. *It's just that now our installed base has taken over a much higher percent of the total, and the increase -- it takes more of an increase to move the utilization, and the increase is historically over time haven't been great enough to counterbalance the numbers of new accounts we've been adding.*

9

10

11

12

100.   Defendant Sawyer was also asked for an explanation on why purchases in individual accounts slowed in the third quarter as compared to the prior two quarters.   The discussion, in pertinent part, is as follows:

13

14

15

**Ben Andrew**

> When you see kind of that maturing account if you will, not the initial order, what are the reasons why the buying patterns slows?

16

**Philip Sawyer**

17

18

19

20

> I would say - I would point to two things. I would say, first of all, *when they first go into an account, they are selling capital plus disposable, and the capital is a one-time sale. So then when you go back the next quarter, you have to redo all that capital to get back to that ratio of your revenues with capital. So, accordingly, you are your next order is going to be lower because it doesn't have capital.*

21

22

23

24

25

26

27

> But there's something else, which I think is quite important, which is that our reps have obviously been growing and being held accountable to grow at a very strong growth rate, and *I think it's a little harder for reps to be what we've learned over time be as measured about developing business and going deep in their account when they're constantly distracted to run up the hill and get big metal orders so that they can hit a near-term number*. And we're trying to take a more strategic longer-term, more fundamental view of the business to, as Jim said, *tilt it more towards disposable so that we don't have to make up as much metal over time every quarter.* .

28

101.     Defendant Sawyer went on to reveal that the market programs the Company employed to expand the women's health division through its Hidden Scar Program also contributed to the sales force focusing on adding new accounts and neglecting to expand beyond that limited practice within existing accounts. Defendant Sawyer engaged in the following exchange with Charles Haff ("Haff"), an analyst with Craig-Hallum:

**Charles Haff**

So, I'm trying to understand your guidance in the fourth quarter, which is lower than you expected. With these discretionary procedures, ***I would think would be gaining strength in the fourth quarter as we see in other areas of healthcare***. Is your business becoming more focused on breast and you're not really expecting much in hip and spine, those discretionary procedures in the fourth quarter like we might see with other discretionary procedures in healthcare that usually get strength in the fourth quarter?

**Jim Mackaness**

So, I think -- I think we would definitely say that we see stability if you like within our ortho and spine. So I don't -- I don't know to your point that we necessarily heighten it to a lead procedure that tends to be breast, so I think that's where you're zeroing in on things. ***So breast is where we've seen most of our growth.*** And so as you said within the fourth quarter, ***we do see little bit of seasonality, but probably not that dramatic uptick that maybe some people are solely focused on spine and ortho would see***.

102.     When further pressed by Haff on the issue, Defendant Mackaness expanded his explanation of how sales representatives were neglecting to go deeper:

And what I mean by that is ***when we look at how we win and go deep in accounts,*** we are able to use all of our products to successfully basically move from as Phil mentioned something like ***breast with nipple-sparing mastectomy perhaps as the entry point and then it allows our reps to go in and talk to the orthopedics to be able to get Yankauer to the spine guys to get Frazier, now to the EP guys to spread it further and the GYN***. And in gynecology we see the Eikon LTs and Yankauer itself actually being very, very suitable currently.

So, I don't know that I'd necessarily want to say one at the expense of the other and each -- the beauty of what we have is by having that

range of product portfolios and disposable of the rep, they can go into each account and modify it according to the profile of that account. So, I think more it's just a question of continue to stay focused within the account and *to basically find whether those extra procedures are and basically start selling into those extra procedures.* So I think it's a more generic answer.

103.   Defendant Sawyer explained that part of the Company's plan to drive deeper sales in active accounts was to utilize clinical sales representatives more effectively, but acknowledged those efforts had already been employed, so the anticipated benefit was limited.   The following exchange described Invuity's efforts:

**Richard Newitter**

*When do you expect some of these -- some of these initiatives that you're putting in place?* It sounds like you're hiring some consultants to go and *help drive deeper depths of penetration.* When do you think you can start to -- when are you going to make those investments and when should we start to expect some of the benefit of those to ramp? Thanks.

**Philip Sawyer**

So, they actually are our own clinical sales reps. *We have a few on board now* and those are one of the avenues we expect to help us to go deeper in accounts over time. The others are, obviously, these various areas, such as EP, GYN, and others that we're very enthusiastic about.

We have, at this point, so as not to get too far ahead of ourselves and to be prudent with the guidance and our cash only counted on *very modest contribution from all these factors* although we're very excited about them as levers in the future, and I think so that we're waiting to play out to know how they're going to parlay into the model. And with respect to actual specifics of time, which was at the beginning of your question, we're going to have to wait and see.

104.   Ultimately, Defendant Mackaness revealed the full extent that active account purchases were frontloaded and consisted of capital expenditures when he made the following statement:

**Ben Andrew**

I'm guessing you have the data and maybe you'll share with us, but percentage of first year revenues on average is coming in in the initial order?

**Jim Mackaness**

It's about -- and again, Ben, do remember we have a wide set of customers with a wide set of buying patterns, so I do want to just make sure we understand that. *But basically we're seeing something in the order of 30% to 35% coming in that first piece of the annual revenue.*

**Ben Andrew**

Okay. . . .   And then what percentage of the first order is capital and I understand the distribution is -- and is it a bimodal distribution or is it in a normal distribution?

**Jim Mackaness**

In answer to your second question, I would suggest we don't have enough data to really understand entirely the bimodal or normal distribution. What we -- *what we've collated to on the average would be there's approximately 50% or may be slightly larger than 50%, 50% to 70% is typically what we see in the -- in the retractor side of the equation if that's the type of purchase the customer is making.*

105.   Upon the release of the after-hours news on November 3, the price of Invuity common stock plunged more than $4 per share, or nearly 45%, to close at $5.10 per share on November 4, 2016, on unusually high trading volume of more than 2.5 million shares, nearly 24 times its average daily trading volume.

106.   On November 3, 2016, Piper Jaffray issued a report in response to the news referring to the miss/guide down as "startling," stating in pertinent part as follows:

> *With the company recently completing a capital raise and following it up with a miss and guide down, we expect the stock to fall considerably tomorrow.*
>
> **Key Points from the Call.** Obviously, the guide down is the most important topic coming out of the call. *Management noted that the*

*company has been so focused on adding new accounts that it has failed to move deeply into existing accounts,* causing some fatigue in its sales force and lack of productivity. As a result of this dynamic, management decided to refine its strategy and attempt to drive deeper penetration in its large installed base. This program will require some more clinical support specialists and a change in behavior from the sales representatives, which management anticipates will take time to implement. This is the primary reason for the expected revenue slowdown[.]

107.    On November 4, 2016, Newitter of Leerink Partners issued a report on the Invuity downturn, addressing the Company's outlook reduction which Leerink Partners noted came as a "surprise," stating in pertinent part as follows:

**Bottom Line: We expect IVTY shares will come under pressure following a 3Q rev miss & lowered '16-'17 sales outlook.** The outlook reduction nonetheless ***came as a surprise*** to us and had to do with the company's balance of new account openings vs. driving deeper account depth penetration, the latter being higher quality and a more sustainable driver but not as much of the growth composition mgmt. would like it to be.

****

**Too Much Focus on "Hunting" & Not Enough on "Gathering" Leads Mgmt To Introduce a 2017 Sales Outlook Below Consensus.** Our understanding of the issue is that ***IVTY's growth has been overly reliant on new account openings in recent quarters, and less derived from deeper account penetration.***

108.    On November 4, 2016, Craig-Hallum released a report lowering its price target for Invuity stock, stating in pertinent part as follows:

Management explained that ***the delta between their prior view and their current view is their lack of sales execution to "go deep" into existing hospital accounts*** (more about this later).

Adding to their pain, they saw strong new account growth in 3Q16 (approximately 100 new accounts) which is helpful for current quarter results but a headwind for next quarter. ***New customers usually order a bolus of product in their first live quarter and then pause in the following quarter before ordering replacement product in future quarters.*** This latter issue is what caused management to dramatically moderate their 4Q16 revenue forecast.

<u>Account Penetration</u> - Management noted on their call that the sales force struggled with "going deeper" into existing accounts…***IVTY's salespeople are incented on revenues and usually their highest revenue activity is opening a new account.*** A new account will place a large initial order for retractors (the razor) and while that is good for the expansion of IVTY's products in new hospitals, ***it came at the expense of salespeople following-up after that initial sale with reorders or going deeper into other therapeutic area of the hospital.***

109.    The November 4 Craig-Hallum report additionally noted that Defendants had to change the incentive compensation plan for the Company's sales force in 2017 to better incentivize salespeople to service new hospitals in future periods.

110.    On November 4, 2016, William Bair issued a report on Invuity which stated in pertinent part as follows:

> ***[T]his is a show-me story where management must rebuild credibility and deliver on its go-deep strategy with its novel products.***
>
> **Key Points**
> **1. Revenue Outlook Has Shifted.** Growth expectations for this story have always been for a steep ramp off a small base, in our view, but we had thought this achievable due to the size of the field organization the company has put in place and the expanding breadth of the product family.
>
> –Management expressed it will most likely work to realign salesforce incentives in the first quarter of 2017 ***to better focus on driving deeper into existing accounts instead of growing the overall number of accounts.***
>
> – According to management ***30%-35% of typical first-year revenues from a new hospital account come in the form of a relatively large stocking order. Also, between 50% and 75% of initial order revenues come from more expensive durable components such as retractors that do not typically recur.*** These metrics suggest that the salesforce has too much incentive to open new accounts to hit quota, but has been lagging at following through to drive deeper utilization in existing accounts.

## SCIENTER ALLEGATIONS

111.    As alleged herein, Defendants acted with scienter in that Defendants knew that: (1) the public documents and statements issued or disseminated in the name of the Company were materially false and misleading at the time they were made; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Invuity, their control over, and/or their associations with the Company which made them privy to confidential proprietary information concerning Invuity, participated in the fraudulent scheme alleged herein.

112.    Despite claiming that the Company's failure to go deeper into active accounts only became apparent near the end of the third quarter, the facts demonstrate that, by no later than the start of the Class Period, Defendants knew Invuity's revenue growth was driven primarily by new accounts and not active accounts, and that Invuity's average revenue per account would not support the exponential growth they touted.  Defendants omitted this material information from their public statements and instead told investors Invuity was "hitting on both cylinders" – meaning the growth it was experiencing was driven by new accounts and by expanding usage of its products in active accounts.  In reality, Invuity's sales quotas and strategy incentivized its sales force to open new accounts at the expense of expanding sales at existing customers.

113.    Defendants' false statements and omissions caused the price of Invuity stock to trade at artificially-inflated levels throughout the Class Period.  Defendants took advantage of the artificially-inflated price by conducting a secondary offering that raised nearly $30 million for the

Company. Moreover, Defendant Sawyer personally profited from the fraud by selling a large number of his personally-held shares for substantial proceeds during the Class Period.

114.    Moreover, both the secondary offering and the insider stock sales were suspicious in timing and amount, and indicate Defendants knew the Company would be unable to continue its growth trajectory well before the end of the third quarter 2016 as claimed.

**Invuity Conducted a Secondary Offering at Artificially Inflated Prices Just Weeks After Telling Investors the Company's Anticipated Revenues Would Support Operations Through the Second Half of 2017**

115.    Invuity has never been a profitable company.  Investors paid close attention to the Company's cash burn and reserves, and Defendants routinely commented on the Company's cash position.

116.    As Defendant Sawyer noted on the Company's Q2 2015 conference call with analysts held August 11, 2015, the Company's initial public offering raised $47 million.  He noted the cash would be used to expand Invuity's commercial infrastructure, including sales and market, to support a large footprint nationally.  Defendant Sawyer also stated the proceeds would be used to create an "agile, disciplined company that can scale rapidly and broadly around [its] unique surgical platform."  As of June 30, 2015, Invuity had total cash and cash equivalents of $65.8 million.

117.    Defendant Mackaness commented on the Company's Q3 2015 conference call that Invuity's balance sheet as of September 30, 2015 showed total cash and cash equivalents of $54 million.

118.    On the Company's Q4 2015 conference call, Defendant Mackaness told investors that the Company's balance sheet as of December 31, 2015 showed cash and cash equivalents in the amount of $46.3 million, with an accounts receivables credit facility of $7.5 million that had not been utilized.   Defendant Mackaness added:

> But I think it makes most sense to think of our expenses in conjunction with our cash burn rate, and **keeping in mind the seasonality of our revenue profile and the recent investment in the sales channel, we see our cash burn cresting in Q1 2016 and then beginning to mitigate,** and for 2016, we're expecting to generate a smaller operating loss for 2016 [than 2015].

119.    On the same call, analyst Newitter pressed Defendants about the Company's cash position and the potential need to raise more money.  Defendant Mackaness outright rejected Newitter's speculation, and Defendant Sawyer repeated the notion that, based on current revenue projections, the Company's cash position was secure until the later part of 2017, stating as following:

> **Richard Newitter**
>
> Good. So I just wanted to start maybe, Jim, with you, recently you presented at a healthcare conference and I think **I'd asked you about mainly your cash position and your future cash needs and if I'm recalling correctly I do believe that you said that you feel comfortable that your current cash position should sustain into the latter half of 2017.**
>
> **Jim Mackaness**
>
>  . . .**we had no immediate plans**. As we've mentioned in the call, **anticipating with the investments we're making within the sales force with some new products**, we're going to -- **and the seasonality of revenue**, we're looking to see the [burn], if you like, peak in this quarter and then mitigate going forward.
>
> And so **we feel very comfortable with the way we are** and we see basic, and to your point, **sort of the in the backend of 2017** if that's -- depending on how we want to run the expenses going forward on the next sort of 18 to 24 months.
>
> **Philip Sawyer**
>
> And the other element to bring up there with respect to flexibilities that current models call for, **as you say, cash comfortably lasting into the latter half of next year.** But the cash required after that is very modest and the company has several different avenues where we choose to raise more cash whether that be the equity markets or through corporate partnering or even debt.

120.   On May 5, 2016, Defendants conducted another conference call with analysts. According to Defendant Mackaness, as of March 31, 2016, Invuity maintained cash and cash equivalents of $33.9 million. Defendant Mackaness also stressed the expectation that the Company's major cash burn for the year was behind it, saying:

> As we mentioned on our last conference call *with the continued investment in the sales force and our focus on bringing new products to market, we anticipated that our cash burn would peak in the first quarter and begins to receive throughout the rest of 2016.*

> Operating expenses in the first quarter are typically high due to our annual national sales meeting. In addition, this quarter also included certain one-time personnel cost. *Therefore we believe that any near-term future increases in quarterly operating expenses will be fairly modest, and we anticipate demonstrating increased operating leverage going forward which gives us confidence in how we are managing our capital resources*.

121.   Again, Defendants rejected any suggestion that Invuity would need to raise cash in the near term. Defendant Mackaness had the following exchange with analyst Newitter:

> **Richard Newitter**

> Okay, good. And then Jim, just for you, I appreciate that the $12 million operating loss represents a kind of a high point and it should improve going forward. *I just want to make sure you still continue to feel confident in the Company's cash position and when do you think you are good to go before you need to kind of tap into financial markets to do any kind of raise?*

> **Jim Mackaness**

> Yes, I think, *we're performing exactly as we had it planned and modeled*. We continue to see the operating leverage play out for the rest this year. And I think as we previously mentioned, *we feel comfortable we have cash into the latter half of 2017.*

122.   Despite this denial, on July 1, 2017, Invuity filed a Form S-3 Registration Statement with the SEC (the "Registration Statement"). The Registration Statement stated that Invuity:

*may offer and sell from time to time*, in one or more series or issuances and on terms that Invuity will determine at the time of the offering, *any combination of the securities described in this prospectus, up to an aggregate amount of $100,000,000*. We will provide specific terms of any offering in a supplement to this prospectus.

123.    The Registration Statement included a prospectus supplement that indicated Invuity intended to sell up to $25 million worth of Company shares.

124.    During the July 19, 2016 earnings call, Defendant Mackaness reiterated that the Company was following through with its plan to reduce cash burn in the second half of 2016, saying:

> We had previously commented that with the majority of our new sales rep hiring occurring in the fourth quarter of 2015 and into the first quarter of 2016, *we expected our overall operating expenses to start to stabilize, and we see our second-quarter performance in line with that expectation*.
>
> . . . As of June 30, 2016, we had cash and cash equivalents of $25.5 million and we have an accounts receivable credit facility of $7.5 million that we've yet to draw down upon. As a result of our increased revenues, expanding gross margins and stable operating expenses, *we used $8.4 million of cash in the quarter, a significant reduction from the $12.4 million used in the first quarter of this year.*

125.    Defendant Mackaness further discussed earnings guidance for the remainder of the year and reiterated that cash usage was proceeding as planned:

> Turning to the rest of the year, *we are maintaining our revenue guidance for 2016 of $35 million to $37 million*. As I commented earlier, we continue to expect further gross margin expansion from our normalized gross margin of 72% due to our anticipated increase in sales volumes going forward, but expect improvements to be of a more modest nature than we've experienced over the last two quarters.
>
> *Our current plans call for any near-term future increases in quarterly operating expenses to be fairly modest,* and we anticipate demonstrating continued operating leverage going forward. We've also previously communicated that cash burn would peak in the first

quarter and begin to mitigate through the rest of 2016. ***Our performance in the second quarter supports this belief and we see this trend continuing.***

126.   The same day, Invuity nonetheless filed with the SEC a letter requesting the Registration Statement be declared effective as of 4:30 P.M. Eastern Time, July 21, 2016.

127.   On July 27, 2016, Invuity filed a preliminary prospectus supplement with the SEC indicating its intent to commence a secondary offering.

128.   On July 28, 2016, Invuity supplemented its Registration Statement with a prospectus and offered 2,800,000 shares of its common stock a price of $10 per share to raise gross proceeds of $28 million.   In addition, the Company announced that underwriters received a 30-day option to purchase up to 420,000 additional shares of its common stock, to cover over-allotments, if any.  The Company expected to receive net proceeds of approximately $25.9 million or $29.9 million if the underwriters exercise in full their option to purchase additional shares, after deducting underwriting discounts and commissions and estimated offering expenses payable.  The Company stated its intention to use the proceeds for: (i) the continued expansion of its sales and marketing activities; (ii) investments in R&D; (iii) potential acquisitions or investments in complementary products, technologies or businesses; and (iv) working capital and other general corporate purposes.  The offering was expected to be completed on or about August 2, 2016.

129.   The timing of the secondary offering undermines Defendants' contention that the Company was expecting to generate sufficient revenue in the latter half of 2016 to fund operations through 2017.   The timing of the cash raise indicates that, by no later than July 1, 2016, Defendants knew the Company's active accounts were subject to a maturation cycle that did not match prior assumptions. Instead of disclosing that Invuity's initial sales to customers were heavily dependent on a nonrecurring capital component, on July 19, 2016, Defendants

misrepresented the Company's success "going deeper" into active accounts to artificially support the stock price long enough to raise the needed cash.

130.   On November 3, 2016, Defendants confirmed that Invuity was executing its plan to lower cash usage throughout the year.  Defendants also revealed that Invuity was anticipating a year-over-year decline in growth, with expected revenue in 2017 exceeding revenue expected revenue in 2016 by as little as just 26%, well below the 60% growth rate analysts were lead to believe would be sufficient to fund operations without raising capital due to its inability to sell enough disposable products to offset initial sales inflated by nonrecurring capital purchases.

**The Individual Defendants' Suspicious Insider Trades**

131.   While in possession of non-public adverse information regarding Invuity's stagnating sales in mature active accounts, Defendant Sawyer took advantage of the artificial inflation of Invuity's stock price caused by Defendants' misrepresentations and omissions.

132.   Between August 24 and October 6, 2016, while Invuity's stock traded at its highest prices since its IPO, Defendant Sawyer exercised a total of 54,000 options, approximately nine percent of his holdings, for a weighted average price of about $13.20.  Defendant Sawyer sold the shares in the following transactions:

| **Transaction Date** | **Number of Shares Sold** | **Price Per Share ($)** | **Proceeds of Sale ($)** |
|---|---|---|---|
| 08/24/16 | 42,000 | 13.0272 | 547,142.40 |
| 09/01/16 | 6,000 | 13.6048 | 81,628.80 |
| 10/03/16 | 5,100 | 13.1600 | 67,116.00 |
| 10/06/16 | 900 | 13.0144 | 11,712.96 |
| | | **Total Proceeds** | **$707,600.16** |

133.   Defendant Sawyer's stock sales were unusual and suspicious in timing and amount. In the 14 months between the Company's IPO and the beginning of the Class Period, he had not sold a single share of Company stock.  Yet, with the stock price artificially inflated during the Class Period, Defendant Sawyer unloaded $707,600 worth of stock, which substantially increased

his compensation for the year.  As shown in the following table, Defendant Sawyer received a salary of $466,667 in 2016 and $425,000 in 2015:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($)(1) | Non-Equity Incentive Plan Compensation ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Philip Sawyer | 2016 | 466,667 | — | 372,500 | 359,030 | 379,516 | 20,582 | 1,598,294 |
| *President, Chief Executive Officer and Director* | 2015 | 425,000 | — | — | 502,350 | 299,089 | 9,959 | 1,236,398 |

134.    Defendants Sawyer's stock sales occurred at the peak of the Company's trading price and would have produced significantly less profit had they occurred after the complete reset of Invuity's growth expectations that was publicly disclosed on November 3, 2016.  These insider sales occurred midway through the third quarter and undermine Defendants' claim that they only learned about the Company's difficulty going deeper into active accounts at the end of the third quarter 2016.

135.    Defendant Sawyer was not the only insider to suspiciously sell shares during the Class Period.  While Defendant Mackaness only began working at Invuity in August 2015 and was not in position to unload his options (as of March, 2016, the Company reported he did not hold any shares of stock), non-party Gerberich followed Defendant Sawyer's lead and unloaded personally-held shares in a similarly suspicious manner.

136.    Gerberich was Invuity's Vice President of Sales from May 2015 to December 2016, and Vice President of Sales and Marketing from October 2012 to May 2015.  In his capacity as Vice President of Sales, Gerberich worked closely with Defendant Sawyer on the Company's sales goals and assigning sales quotas to staff.  Thus, Gerberich was well positioned to understand

the problems Invuity was experiencing going deeper into accounts, and he too sold a large number of shares before the truth was revealed to the market.

137.   Gerberich mirrored Defendant Sawyer's trading pattern by exercising options and selling 13,500 shares, approximately 13% of his total holdings, in three separate transactions on August 24, September 6, and October 6, 2016 for total proceeds of $171,096.

| Transaction Date | Number of Shares Sold | Price Per Share ($) | Proceeds of Sale ($) |
|---|---|---|---|
| 8/24/16 | 10,500 | 12.5295 | $131,559.75 |
| 9/6/16 | 1,500 | 13.6408 | $20,461.20 |
| 10/6/16 | 1,500 | 12.7167 | $19,075.05 |
| | | **Total Proceeds** | **$171,096** |

138.   Like Defendant Sawyer, Gerberich had not sold a single share of Company stock prior to his first sale on August 24.   Gerberich realized a total profit of $171,096, which substantially increased the cash he took home in 2016, as shown in the following chart:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($)(1) | Non-Equity Incentive Plan Compensation ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Robert Gerberich, *Vice President of Sales* | 2016 | 290,000 | — | 96,850 | 93,348 | 155,767 | 47,479 | 683,444 |

139.   On December 31, 2016, Gerberich departed the Company but remained on as a consultant until March 31, 2017.[1]

**Former Employees Described Invuity's Sales Practices and Defendant Sawyer's Access to Information Contradicting the Defendants' Public Statements**

140.   Plaintiff's allegations concerning Defendants' materially false and misleading

---

[1]   Although Defendants' stock sales may have been made pursuant to SEC Rule 10b5-1 trading plans, SEC regulations require that a 10b5–1 plan specify the amount of securities to be sold, the date and price of the sales, or a formula for determining the amount, date and price, and that the plan was "entered in good faith."  17 C.F.R. §240.10b5–1(c)(1)(i) and (ii).

statements and omissions and Defendants' scienter are based, in part, upon interviews with former Invuity employees.  Confidential witnesses described Defendant Sawyer's participation in setting sales practices designed to take advantage of personal networks developed by top salespeople in the industry to obtain large initial capital orders, subsequently followed by smaller orders of disposable items as the product was used.  This system led to heavy turnover as sales quotas increased and the salespeople exhausted their personal networks.

**Confidential Witness No. 1**

141.    Confidential Witness 1 ("CW1") was employed by Invuity between November 2015 and October 2016 as an Area Sales Manager.

142.    CW1 explained that sales quotas were assigned by VP of Sales, Bob Gerberich and Defendant Sawyer. The sales numbers were initially derived from salespeople preparing a business plan that included an estimate of achievable sales.  Quotas were then assigned on a region-by-region basis.

143.    CW1 stated that Invuity maintained a detailed database of doctors utilizing the Company's products.  The database was maintained by the customer-service department, and the Company could, and did, run analytics on the data.

144.    CW1 described customers' large initial purchases to include a significant, non-repeated capital investment.  CW1 described an average initial sale as being approximately $30,000 to $40,000, with the dollar mix between capital and disposable being 70% to 30%, respectively.  Such a purchase might include, for example, $10,000 worth of retractors while a case of disposable parts for the light cost only $300.   CW1 stated that one medical procedure would consume one or two disposable units, which is consistent with Defendants' claim that disposable product use correlated with procedure volume.

145.   CW1 stated that detailed sales reports were prepared by individuals in sales operations who ran analytics on the numbers, which echoed Defendant Sawyer's claim that "real time data" the Company's top executives monitored.

**Confidential Witness No. 2**

146.   Confidential Witness 2 ("CW2") was employed by Invuity between June 2015 and February 2017 as Director of National Accounts.

147.   CW2 explained that in February 2016, a new sales approach was rolled out by Gerberich and Defendant Sawyer.  The new approached involved, in some cases, giving away retractors.  In other cases, customers were offered two for one deals on retractors if the customer agreed to purchase large quantities of disposables.

148.   CW2 stated Defendant Sawyer contacted sales representatives directly to ask questions about sales and confirm the salespeople were not "sandbagging" – *i.e.* delaying sales that could be made at the present time until a later time to spread the sales across different quota periods.  CW2 stated Defendant Sawyer began calling salespeople directly about six or seven months before Gerberich departed the Company.

**Confidential Witness No. 3**

149.   Confidential Witness 3 ("CW3") was employed by Invuity between November 2014 and August 2016 as an Area Sales Manager.

150.   CW3 explained that sales quotas were set by senior management and assigned to area sales managers by the director of the region.  CW3 stated commissions were paid based on both capital purchases and disposables. CW3 stated Invuity closely tracked which portion of CW3's sales was attributable to capital expenditures and which portion was attributed to one-time use products.

151.   CW3 stated Invuity tracked year-over-year and month-over-month sales in both capital and disposables, and tracked sales to each specific hospital.

152.   CW3 confirmed the fact that an active account's second order was smaller than its first order because the second order was only for disposables. CW3 stated that hospitals distinguish between capital expenditures and disposable purchases. According to CW3, the capital budget is capped, while the budget for disposables was unlimited.  CW3 also stated that a hospital would order disposable products directly from Invuity after the initial order, which allowed Invuity to track all disposable sales.

153.   CW3 stated that it was CW3's belief that Gerberich was fired.

**Confidential Witness No. 4**

154.   Confidential Witness 4 ("CW4") was employed by Invuity between September 2015 and August 2016 as an Area Sales Manager.

155.   CW4 stated that CW4 left Invuity when CW4's sales numbers started to plateau.

156.   CW4 stated Invuity's sales strategy involved hiring established top salespeople in the industry in order to gain access to their personal networks of surgeons.   Invuity would then increase the sales quotas to unrealistic levels compared to the previous quarter.  CW4 described this practice as "turn and burn" with the sales force.

157.   CW4 explained the first sale was the big money order. After the initial capital investment, customers reordered disposable products as they were used.  CW4 noted that with an established account, the salesperson must keep going back to make sure Invuity products were being used, but that such return trips did not produce as much money.  CW4 stated it was possible to expand into different specialties within a customer and generate revenue growth through additional capital sales, but ultimately the sales would plateau after the salesperson exhausted the

specialties that utilized Invuity products (primarily breast, spine and orthopedic).  CW4 noted

CW4's ability to grow sales plateaued after approximately one year.

**Defendants Touted Their First-hand Knowledge of Sales Practices and Access to Real-Time Results Showing Detailed Sales Information**

158.    During the Class Period, Defendant Sawyer stressed to investors that he was

heavily involved in understanding and managing the sale process.  Defendant Sawyer described

access to real-time data that, according the multiple former employees, showed what proportion of

each order was attributable to nonrecurring capital purchases versus single-use disposable

purchases.

159.    On the Company's February 24, 2016 conference call with analysts, Defendant

Sawyer described his personal involvement in the selling process.  In response to a question about

hospital adoption of the Company's Hidden Scar Program, Sawyer explained:

> *I went*, for instance, *in a few hospitals last week with one of our reps in Florida and in contrast we met with, in one of the hospitals, the head of marketing, the head of business development, someone in charge of scans and then a few other key surgeons.*
>
> But it was so interesting to be in a hospital where we had to maybe do five minutes of selling and then we were subjected to a half hour of the hospital fawning all over us because they went through this whole analysis to us of how currently they can only reach with -- to do patient in less than a mile perimeter around them and how our program of Hidden Scar and the ability that gives them to beat out their competitors and reach out to a much greater perimeter makes what we're doing critical to them and not only critical but critical to get done quickly. And so all of this together has really helped to increase our momentum.

160.    Defendant Sawyer also touted his access to real-time sales data, when in his

February 24 prepared remarks he said:

> To further capitalize on these programs, we continue to attract and hire top notch reps from the elite surgical technology companies. *The real-time data is showing that the latest hires are becoming productive faster than our initial classes of reps.*

161.    Defendant Sawyer also noted on the February 24, 2016 conference call that the Company's tracked expansion into new markets and was setting the stage for growth in the third and fourth quarters.  In discussing Invuity's effort to go deeper into accounts by expanding into gynecology procedures, Defendant Sawyer said:

> Now we are seeing this uptake in gyne and we see it as quite a significant opportunity going forward but it's important to note **this is real time information** from the last few months.  And so you're **not going to see the real effects on the numbers for say a couple of quarters from now** in terms of being more of the ratio.

162.    On the July 19, 2016 conference call with analysts, Defendant Sawyer again stressed his personal involvement in developing the Hidden Scar Program, a critical component for Invuity to gain access to new customers through its women's health initiative.  Defendant Sawyer provided an example of how the program allowed the Company to go deeper into active accounts:

> [W]e first penetrate the hospitals through on average somewhere between two and three surgeons, and then you have an opportunity to go to more surgeons, to then go to more specialties. This is all with one or two products. Then you have an opportunity to sell additional products into the hospital and you can see how you could have easily a 5 to 10 times multiplier from when you first get into a hospital to how the business really develops over time.

> Also, Hidden Scar continues to help us in this push. A recent experience, we had a training course, Hidden Scar course in the Midwest. **I was at this course** and the chief of breast surgery at one of the most prestigious teaching hospitals in the Pacific Northwest attended the course and earned their certification. She then immediately after leaving the course required all seven attending surgeons in the breast surgery department to earn their Hidden Scar certification. Three surgeons are already certified and the other four will complete their certification by the end of this week. **They are now an Invuity Hidden Scar Center of Excellence and their total sales since becoming a new Invuity account in March of 2016 are over $100,000.** It's an anecdote that speaks to your question and my answer.

163.    On the July 19, 2016 conference call with analysts, Defendant Sawyer discussed his interaction with Invuity's VP of Sales, Gerberich, during the following exchange with Raymond Myers, an analyst with Benchmark:

**Raymond Myers**

Was there much churn in the sales reps, or are they pretty much the same sales reps as before?

**Jim Mackaness**

There's still churn. I would classify it, ***when we talk to Bob who runs the sales*** -- it's of a normative nature, but there is still churn as we get either people moving on or there's an ability to continue to drive performance improvement, so there is an underlying churn, but it's pretty standard.

164.    Defendant Sawyer's admissions that he was personally involved in understanding Invuity's sales practices confirm his access to information that contradicted his public statements about the Company's success "going deeper" into accounts.

**Defendants Set the Compensation Structure That Created a Focus on Capital Sales Instead of Expanding the Customers Use of Disposable Products**

165.    As Defendants admitted on November 3, 2016, the Company's salesforce was not focused on going deeper into existing accounts, and was instead motivated to open additional accounts and expand into new specialties to capture large capital purchases needed to meet increasing sales quotas.  The success of this practice was limited by the relatively few specialties in which Invuity products were used.

166.    On the November 3, 2016 conference call, Defendants described how the Company's compensation structure created an incentive for the sales personnel to open new accounts instead of driving deeper into existing accounts.  As they explained:

**Jim Mackaness**

We do think that to some extent what happens is that reps can get a little bit focused on opening up new accounts. There is a little bit of

that bolus in that first order. So, there's a little bit of that which we recognized that we have to address in trying to balance. ***We've always talked about a balanced approach going into new accounts and going deeper. So, we have to basically readdress that.***

\*\*\*\*\*

**Philip Sawyer**

So, accordingly, your next order is going to be lower because it doesn't have capital. But there's something else, which I think is quite important, which is that our reps have obviously been growing and being held accountable to grow at a very strong growth rate, and I think it's a little harder for reps to be what we've learned over time be as measured about developing business and going deep in their account ***when they're constantly distracted to run up the hill and get big metal orders so that they can hit a near-term number***. And we're trying to take a more strategic longer-term, more fundamental view of the business to, as Jim said, ***tilt it more towards disposable so that we don't have to make up as much metal over time every quarter***. We have a larger disposable recurring date and we give the -- we give the reps a little more latitude to be much more strategic and slightly longer term about how they're building their account.

167.    When pressed on whether changes would be made to the compensation plan to refocus the sales force on going deeper into accounts, Defendants acknowledged the problem and suggested changes were being considered when Defendant Sawyer stated:

So, first of all, with respect to your question on comp plans, we're not changing anything to the comp plan this year. We don't want to late in the year throw anything into the works. ***We are, as I mentioned earlier, having a much more directive management approach with our regional directors, managing the reps much tighter in terms of going deep in accounts and having lower overall numbers allows them more latitude to actually pull that off.***

168.    Confidential witnesses stated Defendant Sawyer, along with Gerberich, set the sales quota numbers for the sales force throughout the Class Period.

## NO SAFE HARBOR

169.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Most of the

false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

170. Invuity's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability. Defendants are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Invuity who knew that the forward-looking statements was false. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:

### FRAUD-ON-THE-MARKET DOCTRINE

171. At all relevant times, the market for Invuity's common stock was an efficient market for the following reasons, among others:

(a)     Invuity's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

1   (b)    the Company had more than 16.93 million shares outstanding as of November 1,

2   2016.  During the Class Period, on average, 82,487 shares of Invuity stock were traded on a daily

3   basis, demonstrating a very active and broad market for Invuity stock and permitting a very strong

4   presumption of an efficient market;

5   (c)    as a regulated issuer, Invuity filed periodic public reports with the SEC;

6

7   (d)    Invuity regularly communicated with public investors via established market

8   communication mechanisms, including regular disseminations of press releases on the national

9   circuits of major newswire services, the Internet and other wide-ranging public disclosures, such

10  as communications with the financial press and other similar reporting services;

11  (e)    Invuity was followed by many securities analysts who wrote reports that were

12  distributed during the Class Period.  Each of these reports was publicly available and entered the

13  public marketplace; and

14

15  (f)    unexpected material news about Invuity was rapidly reflected in and incorporated

16  into the Company's stock price during the Class Period.

17  172.    As a result of the foregoing, the market for Invuity common stock promptly

18  digested current information regarding Invuity from publicly available sources and reflected such

19  information in Invuity's stock price.   Under these circumstances, all purchasers of Invuity

20  common stock during the Class Period suffered similar injury through their purchase of Invuity

21  common stock at artificially inflated prices, and a presumption of reliance applies.

23  **LOSS CAUSATION**

24  173.    During the Class Period, as detailed herein, Defendants made false and misleading

25  statements, and omitted material information, concerning Invuity's business fundamentals and

26  financial prospects and engaged in a scheme to deceive the market.

27

28

174.   By artificially inflating and manipulating Invuity's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed.  Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 3, 2016, causing Invuity's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Invuity securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

175.   As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

176.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly.  These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

177.   The declines in the price of the Company's common stock after the corrective disclosures came to light, as alleged more fully above, were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market

1    conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to

2    defendants' fraudulent conduct.

3        178.    The Company's stock price declined significantly during the Class Period, as the

4    Company's true financial condition was revealed to the investing public.  The economic loss

5    (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants'

6    fraudulent scheme to artificially inflate the price of the Company's common stock and the

7    subsequent significant decline in the value of the Company's common stock when Defendants'

8    prior misrepresentations and other fraudulent conduct were revealed.

9

10                          **CLASS ACTION ALLEGATIONS**

11       179.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of

12   the Federal Rules of Civil Procedure on behalf of all persons and/or entities who purchased or

13   acquired the common stock of Invuity between February 24, 2016 and November 3, 2016,

14   inclusive (the "Class").  Excluded from the Class are officers and directors of the Company as

15   well as their families and the families of the Defendants, and their legal representatives, heirs,

16   successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

17

18       180.    Class members are so numerous that joinder of them is impracticable.  While the

19   exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

20   through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members

21   in the proposed Class. Record owners and other members of the Class may be identified from

22   records maintained by the Company or its transfer agent, and may be notified of the pendency of

23   this action by mail, using the form of notice similar to that customarily used in securities class

24   actions.

25

26       181.    Common questions of law and fact predominate and include whether Defendants:

27   (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or

28

recklessly disregarded that their statements were false; (d) artificially inflated the price of Invuity common stock; and (e) the extent of and appropriate measure of damages.

182.    Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

183.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

184.    Throughout the Class Period, Defendants Invuity and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Invuity common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

185.    During the Class Period, Invuity and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Invuity common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Invuity common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course

of conduct, Invuity and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

186.    In addition to the duties of full disclosure imposed on Invuity and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Invuity's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

187.    Invuity and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

188.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Invuity common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Invuity common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Invuity and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Invuity stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

189.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Invuity and the Individual

Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Invuity shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

190.   By virtue of the foregoing, Invuity and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

191.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

192.   The Individual Defendants had control over Invuity and made the material false and misleading statements and omissions on behalf of Invuity within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

193.   In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

194.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

195.    By reason of such wrongful conduct, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

1  Dated: July 31, 2017                                **GLANCY PRONGAY & MURRAY LLP**

2

3                                                       By:  _s/ Ex Kano S. Sams II_
                                                        Lionel Z. Glancy
4                                                       Robert V. Prongay
                                                        Ex Kano S. Sams II
5                                                       1925 Century Park East, Suite 2100
                                                        Los Angeles, California 90067
6                                                       Telephone: (310) 201-9150
                                                        Facsimile:  (310) 201-9160
7                                                       Email: esams@glancylaw.com

8
                                                        **HOLZER & HOLZER LLC**
9                                                       Corey D. Holzer
                                                        1200 Ashwood Parkway, Suite 410
10                                                      Atlanta, Georgia  30338
                                                        Telephone: (770) 392-0090
11                                                      Facsimile:  (770) 392-0029
                                                        Email: cholzer@holzerlaw.com
12

13                                                      _Lead Counsel for Lead Plaintiff and the Class_

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

2        I, the undersigned say:

3        I am not a party to the above case, and am over eighteen years old.  On July 31, 2017, I served

4 true and correct copies of the foregoing document, by posting the document electronically to the ECF

5 website of the United States District Court for the Northern District of California, for receipt

6 electronically by the parties listed on the Court's Service List.

7        I affirm under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on July 31, 2017, at Los Angeles, California.

9

10                                                            *s/ Ex Kano S. Sams II*
                                                             Ex Kano S. Sams II
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:17-cv-01005-JSW Paciga v. Invuity, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Joni L. Ostler**
  jostler@wsgr.com,jjackson@wsgr.com

- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Ex Kano S. Sams , II**
  esams@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)