**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
EX KANO S. SAMS II (#192936)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| MIKE PACIGA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INVUITY, INC., PHILIP SAWYER and JAMES H. MACKANESS,<br><br>Defendants. | ) | Case No. 4:17-cv-01005-JSW<br><br><u>CLASS ACTION</u><br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>DEMAND FOR A JURY TRIAL</u>** |

Lead Plaintiff Mike Paciga ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys. Such investigation included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Invuity, Inc. ("Invuity" or the "Company"), statements from former employees of the Company, as well as the review of media, analyst reports, and conference call transcripts about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or otherwise acquired the securities of Invuity between February 24, 2016 and November 3, 2016, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Invuity is a medical-manufacturing company that operated on the razor-blade model. Invuity's products consisted of retractors and disposable lights that attach to the retractors and illuminate body cavities during surgery. Physicians replaced the disposable lights for subsequent procedures, which led to additional sales for Invuity.

3. During the Class Period, Defendants told investors that Invuity was pursuing a two-pronged approach to generate exponential sales growth. First, Invuity was trying to add new accounts. Invuity's sales representatives used their pre-existing relationships at hospitals to gain access for the Company's products – normally through one of Invuity's three surgical divisions. Second, Defendants purportedly would go "deeper" at those hospitals by expanding to additional surgical specialties and by selling more disposable products as those surgeons utilized Invuity's products. Investors were keenly focused on Invuity's progress in executing the second aspect of

its growth plan – going deeper – because initial purchases alone could not support the compounding growth Invuity needed to become profitable.

4. Indeed, Defendants told investors during the Class Period that average revenue per account was a critical metric for showing progress executing the plan. If Invuity was successful in both adding new accounts and going deeper into existing accounts, its average revenue per account would remain stable or increase. If, on the other hand, doctors were not reordering enough disposable products – or if the sales force was not moving into additional specialties – Invuity's average revenue per account would inevitably decline because the existing accounts would not contribute enough revenue to offset the increase in total accounts.

5. On February 24, 2016, at the start of the Class Period, Defendants falsely stated that Invuity was successfully going deeper into accounts, as purportedly indicated by Invuity's average revenue per account of approximately $11,000. Defendants told investors that Invuity's business model created predictability and profitability, and provided specific revenue guidance based upon such anticipated predictability and profitability. Defendants also claimed that with the anticipated benefits of seasonality inherent in the medical device manufacturing industry, they did not see "any limit" to Invuity's ability to drive "exponential growth."

6. These claims were false and misleading. Contrary to Defendants' representations, Invuity remained dependent on adding new customers because a material percentage of its active accounts fell into a "step back" pattern that could not support compounding growth. The revenue generated from initial sales to new accounts consisted largely of non-recurring capital expenditures for retractors and other hardware. Defendants used incentives and give-aways to supplement initial orders with sales of disposable products. This practice had the effect of meeting sales quotas, but did not encourage utilization of disposable products. As Defendants later admitted, once the account fell into the step-back pattern, it would take time to "rebuild" the revenue generated by that account, and exponential growth necessarily would be delayed for at least several quarters.

7. Additionally, Invuity's compensation structure created an incentive for its sales representatives to "run up the hill and get big metal orders" instead of maintaining relationships

with doctors and surgeons to ensure the use of Invuity's disposable products. As described herein, ***ten*** former Invuity employees – from different geographical areas and across different divisions – corroborate the facts alleged, and many of them consistently described this step-back sales pattern as being known company-wide during the Class Period. Thus, the Individual Defendants knew, or disregarded with deliberate recklessness, the material fact that the undisclosed step-back sales pattern undermined Invuity's growth plan. The undisclosed step-back sales pattern, moreover, was inconsistent with Defendants' representations to sell more in depth to existing customers because, as analysts declared after the end of the Class Period, "***growth has been overly reliant on new account openings in recent quarters, and less derived from deeper account penetration.***"

8. As Invuity's top executives, the Individual Defendants were responsible for setting sales quotas for the Company and creating the compensation structure that contributed to the step-back sales pattern. The Individual Defendants also participated in conference calls and had access to real-time data showing which portion of sales was attributable to capital and which portion was attributable to disposable products. The Individual Defendants also caused Invuity to conduct a secondary offering in July 2016 to raise cash for operational needs, which further indicates that they were well aware by that time that Invuity would not generate second-half revenue growth in accordance with the initial plan.

9. Additionally, on November 3, 2016, Defendants disclosed that sales growth into existing accounts – *i.e.* going deeper – was insufficient to support Invuity's projected second half growth. Defendants led investors to believe that Invuity was executing its plan in both timing (second half of 2016) and execution (going sufficiently deep into existing accounts to allow the average revenue per account to remain stable). Neither aspect had gone to plan.

10. Defendant Sawyer made it clear that despite selling more to existing customers overall in the third quarter, the sales increase was insufficient to meet the plan to grow revenue by 50% ***in 2016***. As summarized by a Craig-Hallum analyst: "the delta between [Defendants'] prior view and their current view is their lack of sales execution to 'go deep' into existing hospital accounts[.]"

11. Richard Newitter, an analyst from Leerink Partners, pressed Defendant Sawyer on what changed between the third quarter results – when Defendants continued to expect a 50% growth rate – and the fourth quarter results that showed such a dramatic slowdown.

12. In response, Defendant Sawyer explained the direct link between the step-back sales pattern and the reduced guidance and admitted that making up for the lost growth caused by the step-back sales pattern was not possible before the end of 2016:

> ***[I]f you do take out the first orders*** and look at our then base business without that first order, over time, ***you do see a nice steady increase*** on a yearly basis. It's just that ***now our installed base has taken over a much higher percent of the total***, and the increase – it takes more of an increase to move the utilization, and ***the increase is historically over time haven't been great enough*** to counterbalance the numbers of new accounts we've been adding.

13. Defendant Sawyer claimed that Defendants only learned about the insufficient growth, which was directly attributed to the step-back sales pattern, towards "the very end of Q3." Defendants' conduct throughout the Class Period, however, shows they knew about the step-back sales pattern and its impact on second half growth by no later than February 2016, but failed to disclose those facts until November 2016 because they contradicted the claim that everything was going "exactly to plan."

14. Confidential witnesses from across the country and from a multitude of departments within Invuity explained that the step back sales pattern was well known throughout the Company during the Class Period. Witnesses also describe Defendant Sawyer's personal involvement in trying to bolster disposable sales by no later than February 2016. Defendants' abrupt shift to raise capital in July 2016 – just weeks after telling investors there was no need to raise money – indicates they knew Invuity was not "going deep" ***enough*** into accounts.[1]

15. Only on November 3, 2016 did Defendants finally reveal the truth, and Invuity's stock price crashed 45% amid a multitude of analysts questioning Defendants' credibility.

---

[1] While the Court previously found Defendant Sawyer's stock sales were not suspicious in amount, it is worth noting he profited from the sale of $707,600.16 worth of stock between August 24, 2016 and October 6, 2016, which marked his first stock sale in at least 14 months.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

17. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). The acts and transactions giving rise to the violations of law complained of occurred in this District, and Invuity's headquarters are located in this District.

## PARTIES

18. Plaintiff Mike Paciga purchased Invuity common stock during the Class Period as described in the certification previously filed and incorporated herein by reference and suffered damages as a result.

19. Defendant Invuity is a California corporation with its principal executive offices located in San Francisco, California.

20. Defendant Philip Sawyer ("Sawyer") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Invuity and a member of its Board of Directors.

21. Defendant James H. Mackaness ("Mackaness") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Invuity.

22. Invuity, Sawyer, and Mackaness are referred to herein as "Defendants." Defendants Sawyer and Mackaness are referred to herein as the "Individual Defendants."

23. During the Class Period, the Individual Defendants served as Invuity's executive management and oversaw the Company's operations and finances. The Individual Defendants were intimately knowledgeable about all aspects of Invuity's financial and business operations. They were also intimately involved in deciding which disclosures would be made by Invuity. The Individual Defendants made various public statements for Invuity during the Class Period and participated in Class Period analyst conferences.

24. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information

concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**BACKGROUND AND RELEVANT PRE-CLASS PERIOD STATEMENTS**

25. Invuity is a commercial-stage, medical technology company. Utilizing the Company's propriety Intelligent Photonics technology, Invuity provides surgeons with single-use and reusable illumination devices to improve intra-cavity visualization in the operating room. The Company markets its devices to surgeons, hospital group purchasing organizations, and integrated-delivery networks through the Company's team of sales representatives. Invuity sells its devices within the United States predominately through this direct sales force.

26. The Company generated revenue from the sale of its disposable and reusable surgical devices and accessories. The reusable surgical devices included retractors, handheld aspiration devices, and drop-in intra-cavity illuminators. The retractors required a new, single-use optical waveguide for each procedure. Invuity operated on a razor/razor-blade model. Utilization of Invuity's devices during surgery was critical to its growth plan, which relied on compounding growth driven by disposable-product sales. Defendants claimed to generate the majority of the Company's revenue from single-use products, whose sales mirror procedure volumes.

27. The Company described its business as seasonal. In medical-device companies, first-quarter softness often results from patients deferring elective procedures following the reset of patient health-insurance deductibles at the start of the year, as well as from facilities working

through excess inventories from the surge in procedure volume during the fourth quarter. Demand tends to be the highest in the fourth quarter, as patients are more inclined to undergo an elective procedure in order to spend the remaining balance in their flexible-spending accounts, or because they reached their deductible threshold.

28. Invuity was not profitable despite steadily growing revenue and sales.

29. In 2015, Defendants articulated a specific plan to achieve compounding revenue growth. At the time, Invuity's growth was grounded in its ability to open new accounts. According the plan, Invuity's sales focus would transition from opening new accounts to expanding sales within existing accounts. Defendants called this aspect of the business "going deeper" – *i.e.* expanding sales within customers who had made purchases in products the previous quarter. According to Defendants, the plan to go deeper would produce a compounding element to the sales that would drive exponential growth.

30. Invuity's claim of compounding growth depended upon the successful execution of both aspects of the plan – adding new accounts and going deeper into existing accounts. Average revenue per account was a metric Invuity presented as a way to measure success executing its growth plan. As Invuity continued to open new accounts, those new accounts would make up a progressively-smaller percentage of the total accounts, which meant that an ever-increasing level of recurring sales would be needed to maintain the average revenue per account.

31. A stable or growing average revenue per account quarterly number would show investors that Invuity was successfully executing both aspects of its plan to "go deeper" into existing accounts. A decline in average revenue per account would indicate that sales to existing customers were not sufficient to maintain Invuity's compounding growth trajectory.

32. When discussing third quarter 2015 results immediately before the Class Period, Defendant Sawyer said: "we've been increasingly successful in going deep within existing accounts by moving to additional surgeons specialties."

33. Defendant Mackaness indicated that Invuity's quarterly growth was not supported by any one-time benefits and said that Invuity was "not seeing any, sort of, notable trends." Instead, Defendant Mackaness explained that the Company was "pleased with the accretion of

new accounts . . . [and] with our abilities, obviously, going deep." Defendants, moreover, were expecting to add "key account managers" during the quarter to assist sales representatives in their territories to drive utilization in existing accounts.

34. On February 23, 2016, the day before the Class Period begins, the Company's General Counsel (and former Chief Business Officer), Brett Robertson, announced her resignation effective March 31, 2016.

**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

**Invuity Conducts Fourth Quarter 2015 Earnings Call**

35. On February 24, 2016, Invuity hosted an earnings conference call to discuss the Company's fourth quarter and year end 2015 financial results.

36. Invuity's shift from growth that relied primarily on adding new accounts to growth fueled by "going deeper" into existing accounts such that Invuity could achieve exponential revenue growth commenced in earnest during the quarter.

37. Defendants falsely represented that Invuity's results in the quarter showed their plan to expand within existing accounts was working and could support exponential growth. Defendants Sawyer stated:

> [W]e showed excellent progress and success in increasing our active account base and winning new accounts. . . . In addition, ***we went deeper in existing accounts*** and our total cumulative procedure volume increased to 145,000 up from 80,000 this time last year.

38. Rick Wise, an analyst from Stifel, Nicolaus & Company, Inc. ("Stifel") questioned whether growth in the quarter was "really driven by new account" additions, as the numbers indicated to him. To contest the notion that new accounts were the only reason for Invuity's growth, Defendant Sawyer responded: "I think we do need to discuss that with you ***because we actually have been going deeper.***"

39. Defendant Mackaness responded further to Wise's question:

> ***I think what you're seeing is a combination of the two*** that you are seeing in the fourth quarter active account base which are picked up nicely.

40. Defendant Mackaness stated: "We are definitely seeing an increase in the installed base. . . purchasing multiple SKUs which we use as a proxy for going to models. ***So that trend [of going deeper] is continuing in the right direction***."

41. Defendants Sawyer and Mackaness also told investors that Invuity's sales were sufficient to achieve compounding growth, which was necessary for it to reach profitability.

42. Defendant Sawyer told investors: "***We don't really see any limit right now with respect to the equation of going deep into these hospitals."***

43. Defendant Mackaness summarized the Company's ability to achieve "exponential growth" by continuing to go deeper into existing accounts, saying:

> ***the growth really is, and it's one of the benefits we have is, an element of being exponential. . . . So, it's just that compounding element of*** [adding new accounts, adding new specialties, and selling more disposables] ***to drive exponential growth.***

44. Defendants told investors that the average revenue per account for the quarter indicated Invuity was successfully executing its growth plan. Specifically, Defendant Mackaness stated as follows:

> So on the average account, we had had it really close to that 11,000 of the quarter which is sort of held up fairly consistent during the last couple of quarters . . . ***so keeping the average around [flat] is kind of ideal***

45. Moreover, during the Company's February 24, 2016 conference call, the Company provided investors revenue guidance for 2016, and stated that Invuity expected 2016 revenues between $35 million and $37 million.

46. The statements in ¶¶37-45 claiming that Invuity was going deeper and the quarterly sales results supported the plan to achieve compounding growth and the information that Defendants provided regarding revenue guidance for 2016 were false and misleading. At the time the statements were made, a material number of Invuity's accounts were falling into a "step back" sales pattern whereby the initial sale was significantly larger than the subsequent sale. The "step back" sales pattern eliminated Invuity's ability achieve compounding growth until late 2017, at best. This information was concealed from investors throughout the Class Period.

47. Specifically, the statements in ¶¶37-45 omitted the following information:

a. average revenue per-account numbers were not indicative of success in executing the sales-growth plan because sales were not going deep fast enough to counterbalance the accretion of new accounts (*See* ¶¶70-72);

b. in a material cohort of customers, an initial sale to a new customer constituted 30% to 35% of the customer's annual revenue, of which 50% to 70% of the initial order was attributable to retractors and other non-disposable products (*See* ¶¶73-74);

c. Invuity's commission structure contributed to creating a step-back sales pattern by encouraging its sales representatives to pursue new accounts instead of going deeper in existing accounts because the increased revenue derived from initial sales helped the sales force reach challenging sales quotas (*See* ¶¶75, 94, 98, 105);

d. this sales pattern was sufficiently prevalent to eliminate Invuity's ability to generate the compounding growth needed to support the Company's market valuation until late 2017 because additional time was needed to rebuild the revenue lost from the stepped back second order (*See* ¶¶76-79); and

e. end-of-quarter sales incentives and initial stocking orders contributed to the step-back sales pattern because the number of disposables purchased did not reflect the actual utilization (*See* ¶¶92-94; 107-09; 112-13; 116-22).

48. Defendants also made false statements about seasonality. Defendant Mackaness stated: "we would expect to see seasonality in our business with the first quarter being the most difficult and the fourth quarter being the strongest." Defendant Mackaness stated that he expected 40% of Invuity's revenue to be generated in the first half of 2016, with the remainder to come in the second half because of the seasonality medical device manufacturers frequently experience.

49. The statement in ¶48 was false and misleading because Invuity's new accounts were concentrated in its breast division, not in its spine or ortho divisions. The breast division, which primarily involves non-elective procedures, does not benefit from the same seasonality that the spine and ortho divisions experience given the elective nature of those procedures. *See* ¶80.

50. Additionally, Defendants made false statements about the quality of Invuity's data and its ability to use that data to accurately predict profitability. Defendant Sawyer told investors:

> ***One of the special aspects of our business model today*** is that a significant portion of our revenue stream currently about 80% generated by our single-use products that generated higher growth margin. This in turn provides significant value to the company and shareholders through the ***predictability and profitability*** of this type of business.

51. The statement in ¶50 was false and misleading because, at the time, there was a level of "noise still within the data" such that Invuity had difficulty accurately predicting its profitability or its sales. *See* ¶81.

**Invuity Conducts First Quarter 2016 Earnings Call**

52. On May 5, 2016, Invuity announced its first quarter 2016 financial results for the reporting period ended March 31, 2016. The Company filed its first quarter 2016 Form 10-Q with the SEC and reported revenue of $6.4 million, compared to $4.4 million in the first quarter of 2015, driven by both an increase in active accounts and an increase in the revenue per active account.

53. Defendants presented an example of how Invuity's Hidden Scar Program was driving an increase in disposable sales which supported Defendants' plans to achieve compounding growth by going deeper in accounts. Defendant Sawyer said:

> [A hospital in Florida's] disposable unit volume has tripled since adopting Hidden Scar from 100 per quarter to more than 300 units within two quarters." Defendant Sawyer later added: "[f]or the balance of 2016, we're focused on execution. We'll continue to implement programs to . . . such as Hidden Scar . . . to drive new account growth and deeper penetration within existing accounts."

54. Defendant Mackaness further indicated this sales pattern was occurring with sufficient frequency to achieve the desired financial results: "We like the momentum, we like the trajectory, we think we're executing on the plan[.]"

55. Defendant Mackaness, in response to a question by an analyst from Leerink Partners, stated: "I think, we're performing ***exactly*** as we had it planned and modeled."

56. The statements in ¶¶53-55 were misleading because they omitted material information. Specifically, Defendants failed to disclose that:

a. the average revenue per account results did not indicate success because the number of active accounts that fell into the sales pattern described at the Florida hospital was insufficient to support exponential growth (*See* ¶¶70-72; 76-79);

b. the undisclosed step-back sales pattern was occurring with sufficient frequency to prevent Invuity from achieving compounding growth until late 2017, at the earliest, which was inconsistent with the stated plan and the modeled revenue numbers (*See* ¶¶76-79);

c. end-of-quarter sales incentives and initial stocking orders contributed to the step-back sales pattern because the number of disposables purchased did not reflect the actual utilization (*See* ¶¶92-94; 107-09; 112-13; 116-22); and

d. there was "noise" in the data such that Invuity had difficulty accurately predicting its profitability or its sales. *See* ¶81.

**Invuity Conducts Second Quarter 2016 Earnings Call**

57. On July 19, 2016, Invuity announced its second quarter 2016 financial results for the reporting period ended June 30, 2016.

58. In discussing the results, Defendant Sawyer told investors that Invuity was executing its plan to achieve compounding growth. During the earnings conference call held the same day, Defendant Sawyer stated:

> Revenue per account was $12,500 in the quarter, an increase from $10,400 in Q2 2015, ***demonstrating our ability to go deeper in each account.***
>
> ****
>
> ***We continue to see evidence that once we have a foothold in an account that we can be successful in expanding the number of specialties that use our products.***

59. Defendant Mackaness said Invuity's improvement in average revenue per account was attributable to growth across multiple procedural areas, and was not contained to the breast division. Specifically, Defendant Mackaness stated:

> ***[W]e would classify it as broad-based***. As you know, it can be a little bit more qualitative than quantitative on tracking our products to the actual procedures, but we did do a synergy check with the sales channel and they felt that the percentage sold across the disciplines remained constant, ***so I'd say it was a broad-based penetration.*** . . .
>
> Talking about things like for example how accessing gynecology within existing sites gives us that incremental ability to go deeper. ***So that's always been part of the strategy that continues to play out.***

60. Defendant Sawyer said Invuity's ability to go deeper quickly had accelerated during the quarter, stating:

> [W]e just noted, ***we are going deeper in the hospitals***, and when you go deeper, you are able to move either – sometimes you have no more mandatory need to go through Value Analysis Committee, ***and then sometimes it's quicker***. And so that has ***definitely helped*** to compress the overall time tables.

61. Defendant Mackaness pointed to the improving performance of the recently expanded sales force as evidence that Invuity was executing on its plan to achieve compounding sales growth, stating:

> ***So far, it's really going according to plan, which is*** excellent . . . we went through a lot of the organizational movements in 2015, which allowed us to start 2016 with a pretty stable plan, stable territory map, allowing the reps to really get their feet underneath them and that was coincident obviously as you said with the timing and the maturation. ***So it's really all moving according to plan at this stage.***

62. The statements in ¶58-61 were misleading because Defendants omitted material information. Specifically, the statements failed to disclose that:

a. the undisclosed step-back sales pattern was occurring with sufficient frequency to prevent Invuity from achieving compounding growth until late 2017, at the earliest,

which was inconsistent with the stated plan and the modeled revenue numbers (*See* ¶¶76-79);

b. Invuity's growth was concentrated in its breast division, not in its spine or ortho divisions. The breast division, which primarily involves non-elective procedures, does not benefit from the same seasonality that the spine and ortho divisions experience given the elective nature of those procedures. (*See* ¶80);

c. rather than growing sales after establishing a "foothold," Invuity's commission structure contributed to creating the undisclosed step-back sales pattern by encouraging its force to pursue new accounts instead of going deeper in existing accounts because the increased revenue associated with initial sales to reach challenging sales requirements (*See* ¶¶75, 94, 98, 105);

d. end-of-quarter sales incentives and initial stocking orders contributed to the step-back sales pattern because the number of disposables purchased did not reflect the actual utilization (*See* ¶¶92-94; 107-09; 112-13; 116-22); and

e. there was "noise" in the data such that Invuity had difficulty accurately predicting its profitability or its sales. (*See* ¶81).

63. When asked by an analyst whether Defendants had seen any "plateauing" in the Company's growth rates in existing accounts, Defendant Sawyer was unequivocal in saying that Invuity was executing according to its plan to achieve compounding growth. Specifically, Defendants Sawyer made the following claim:

> We've been very encouraged by the – at our smaller stage of company, the ***seemingly open-ended opportunity available to us to go deep in hospitals*** because when you think about it, we first penetrate the hospitals through on average somewhere between two and three surgeons, and then you have an opportunity to go to more surgeons, to then go to more specialties. This is all with one or two products. Then you have an opportunity to sell additional products into the hospital and ***you can see how you could have easily a 5 to 10 times multiplier from when you first get into a hospital to how the business really develops over time***.

64. The statement in ¶63 was false and misleading because the undisclosed step-back sales pattern was occurring at sufficient rates to prevent Invuity from achieving compounding growth until late 2017, at the earliest, which was inconsistent with the claim that the sales growth in mature accounts was going according to plan. *See* ¶76-79.

65. In response to the false statements issued throughout the Class Period, Invuity's stock price rose significantly. Invuity stock price closed at $9.66 per share on July 19, 2016 before reaching an intra-day high of $12.31 on July 25, 2016. The stock reached a Class Period high of $14.25 per share on September 2, 2016.

**TRUTH IS REVEALED**

66. On November 3, 2016, after the close of trading, Invuity reported its third quarter 2016 earnings for the period ended September 30, 2016. Defendants disclosed the cascading effect of Invuity's inability to sufficiently increase sales to active accounts. Defendants blamed the Company's failure on a previously undisclosed step-back sales pattern, stating: "Based on this expectation, we're reducing our 2016 revenue guidance to a range of $32 million to $32.5 million" and presented 2017 guidance that was significantly below Wall Street expectations of compounding growth.

67. In the conference call discussing the results, Defendant Sawyer stated as follows:

> Although our revenue growth this quarter was strong at 52%, it was lower than expected. ***The primary reason for the shortfall was lower revenue per active account than anticipated***. While we saw a significant and encouraging increase in accounts this quarter, ***revenue per account declined sequentially from 12,500 in Q2 to 11,500 in Q3.***

68. Defendant Sawyer also stated "the continued increase in active accounts has made it difficult to significantly increase the average revenue per account."

69. Defendant Sawyer explained: "the ongoing increase in our base of active accounts is anticipated to largely offset expected procedural volume gains in the quarter."

70. Defendant Mackaness revealed that prior claims of going deeper in existing accounts at a sufficient level to support the plan to achieve compounding growth were false and materially overstated. Specifically, Defendant Mackaness revealed:

> [A]s we put more new accounts in it kind of pulls that average down. We do see success in going deeper in certain accounts but ***at this stage we've not really been able to see that deeper going across all of the active accounts*** as we kind of anticipated.

71. Defendant Sawyer disclosed that instead of executing exactly on plan, Invuity was not sufficiently going deeper into accounts to support the continued expansion of its customer base as was required to achieve the plan. Specifically, Defendant Sawyer said:

> And while we're going deeper ***in terms of making progress***, the addition of so many new accounts this past quarter made it clear to us that ***we weren't going deep fast enough to counterbalance the accretion of so many new accounts***.

72. Defendant Mackaness explained that despite Class Period assurances, Invuity never penetrated accounts to a sufficient degree to offset the gains in customer accounts needed to maintain a stable average per account. Specifically, Defendant Mackaness said:

> Now [that] our installed base has taken over a much higher percent of the total, and the increase – it takes more of an increase to move the utilization, and ***the increases historically over time haven't been great enough*** to counterbalance the numbers of new accounts we've been adding

73. Defendant Sawyer explained that Invuity's failure to go deeper into accounts was the result of a previously undisclosed step-back sales pattern. Specifically, Defendant Sawyer described the step-back sales pattern for the first time as follows:

> [W]hen [the sales representatives] first go into an account, they are selling capital plus disposable, and the capital is a one-time sale. So then when you go back the next quarter, ***you have to redo all that capital to get back to that ratio of your revenues with capital.*** So, ***accordingly,*** your next order is going to be lower because it doesn't have capital.

74. Defendant Mackaness further described the step-back sales pattern as follows:

> [B]asically we're seeing something in the order ***of 30% to 35% coming in that first piece of the annual revenue.***
>
> ****
>
> [W]hat we've collated to on the average would be there's approximately 50% or may be slightly larger than 50%, ***50% to***

> ***70% is typically what we see in the – in the retractor side of the equation*** if that's the type of purchase the customer is making.

75. Defendant Sawyer blamed the compensation structure for the sales force's failure to focus on going deeper in existing accounts. Specifically, Defendant Sawyer made the following statement:

> ***[I]t's a little harder for reps*** to be what we've learned over time be as measured about developing business and going deep in their account ***when they're constantly distracted to run up the hill and get big metal orders so that they can hit a near-term number***.

76. Defendant Mackaness explained how the step-back sales pattern meant Invuity could not achieve compounding growth until late 2017, at best:

> ***We've kind of got ourselves into a holding pattern on the average active account revenue.*** …. as Phil mentioned, because we have the compounding effect when you find it sort of in a holding pattern in the early quarters***, it cumulates pretty quickly when you start to look three, four quarters out.***

77. Defendant Mackaness further explained the step-back sales pattern was not consistent with exponential or compounding growth:

> [W]e tend to find there is a little bit of a heavier first order. And then what happens is as the account sort of goes into its buying pattern ***it steps down in the subsequent quarter and starts to rebuild.***

78. Defendant Sawyer continued:

> [C]reating so many new customers is great for the top line, but it also has its challenges because they tend to order more in the first order, and then they drop to a level rate in the next order, ***which then has to build up over time.***

79. Defendant Mackaness described the impact the step-back sales pattern had on Invuity's stated plan to achieve exponential growth:

> [I]f you think of our business as a line that compounds over time, ***if you remove that compounding . . . [it] result[s] in lower numbers***.

80. Defendants also revealed that prior claims that Invuity was going deeper into existing accounts through expanding into different procedures were false and, as a result, Invuity was not poised to benefit from seasonality. Specifically, Defendant Mackaness admitted:

> ***So breast is where we've seen most of our growth.*** And so as you said within the fourth quarter, ***we do see little bit of seasonality, but probably not that dramatic uptick that maybe some people are solely focused on spine and ortho would see***.

81. Finally, Defendants admitted that the data used to support Invuity's projections and claims of financial success was not sufficiently reliable. Specifically, Defendant Mackaness said:

> [P]art of what we've got is obviously the applicability of our products we use that we apply across a large range of both hospitals and specialties as you know. ***So what that means is there is quite a lot of noise still within the data.***

82. Upon the release of the after-hours news on November 3, the price of Invuity common stock plunged more than $4 per share, or nearly 45%, to close at $5.10 per share on November 4, 2016, on unusually high trading volume of more than 2.5 million shares, nearly 24 times its average daily trading volume.

**Analysts raise questions about the veracity of the Individual Defendants' Class Period statements following the release of third quarter results**

83. On November 3, 2016, Piper Jaffray issued a report in response to the news referring to the miss/guide down as "startling," stating in pertinent part as follows:

> ***With the company recently completing a capital raise and following it up with a miss and guide down, we expect the stock to fall considerably tomorrow.***
>
> **Key Points from the Call.** Obviously, the guide down is the most important topic coming out of the call. ***Management noted that the company has been so focused on adding new accounts that it has failed to move deeply into existing accounts,*** causing some fatigue in its sales force and lack of productivity. As a result of this dynamic, management decided to refine its strategy and attempt to drive deeper penetration in its large installed base. This program will require some more clinical support specialists and a change in behavior from the sales representatives, which management anticipates will take time to implement. This is the primary reason for the expected revenue slowdown[.]

84. On November 4, 2016, Leerink Partners issued a report on the Invuity downturn, addressing the Company's outlook reduction which Leerink Partners noted came as a "surprise," stating in pertinent part as follows:

> **Bottom Line: We expect IVTY shares will come under pressure following a 3Q rev miss & lowered '16-'17 sales outlook.** The outlook reduction nonetheless ***came as a surprise*** to us and had to do with the company's balance of new account openings vs. driving deeper account depth penetration, the latter being higher quality and a more sustainable driver but not as much of the growth composition mgmt. would like it to be.
>
> ****
>
> **Too Much Focus on "Hunting" & Not Enough on "Gathering" Leads Mgmt To Introduce a 2017 Sales Outlook Below Consensus.** Our understanding of the issue is that ***IVTY's growth has been overly reliant on new account openings in recent quarters, and less derived from deeper account penetration.***

85. On November 4, 2016, Craig-Hallum released a report lowering its price target for Invuity stock, stating in pertinent part as follows:

> Management explained that ***the delta between their prior view and their current view is their lack of sales execution to "go deep" into existing hospital accounts*** (more about this later).
>
> Adding to their pain, they saw strong new account growth in 3Q16 (approximately 100 new accounts) which is helpful for current quarter results but a headwind for next quarter. ***New customers usually order a bolus of product in their first live quarter and then pause in the following quarter before ordering replacement product in future quarters.*** This latter issue is what caused management to dramatically moderate their 4Q16 revenue forecast.
>
> <u>Account Penetration</u> - Management noted on their call that the sales force struggled with "going deeper" into existing accounts…***IVTY's salespeople are incented on revenues and usually their highest revenue activity is opening a new account.*** A new account will place a large initial order for retractors (the razor) and while that is good for the expansion of IVTY's products in new hospitals, ***it came at the expense of salespeople following-up after that initial sale with reorders or going deeper into other therapeutic area of the hospital.***

86. On November 4, 2016, William Blair issued a report on Invuity which stated in pertinent part as follows:

> ***[T]his is a show-me story where management must rebuild credibility and deliver on its go-deep strategy with its novel products.***
>
> **Key Points**
> **1. Revenue Outlook Has Shifted.** Growth expectations for this story have always been for a steep ramp off a small base, in our view, but we had thought this achievable due to the size of the field organization the company has put in place and the expanding breadth of the product family.
>
> –Management expressed it will most likely work to realign salesforce incentives in the first quarter of 2017 ***to better focus on driving deeper into existing accounts instead of growing the overall number of accounts.***
>
> – According to management ***30%-35% of typical first-year revenues from a new hospital account come in the form of a relatively large stocking order. Also, between 50% and 75% of initial order revenues come from more expensive durable components such as retractors that do not typically recur.*** These metrics suggest that the salesforce has too much incentive to open new accounts to hit quota, but has been lagging at following through to drive deeper utilization in existing accounts.

## SCIENTER ALLEGATIONS

87. As alleged herein, Defendants acted with scienter in that Defendants knew, or acted with deliberate recklessness in not knowing, that:

a. sales were not going deep fast enough to counterbalance the accretion of new accounts (*See* ¶¶70-72);

b. in a material cohort of customers, an initial sale to a new customer constituted 30% to 35% of the customer's annual revenue, of which 50% to 70% of the initial order was attributable to retractors and other non-disposable products (*See* ¶¶73-74);

c. Invuity's commission structure contributed to creating a step-back sales pattern by encouraging its sales force to pursue new accounts instead of going deeper in

existing accounts because the increased revenue associated with initial sales to reach challenging sales requirements (*See* ¶¶75, 94, 98, 105);

d. this sales pattern was sufficiently prevalent to eliminate Invuity's ability to generate the compounding growth needed to support the Company's market valuation until late 2017 because additional time was needed to rebuild the revenue lost from the step-back second order (*See* ¶¶76-79);

e. Invuity's growth from new accounts concentrated in its breast division, which primarily involve non-elective procedures and does not benefit from the same seasonality that the spine and ortho divisions experience given the elective nature of those procedures (*See* ¶80); and

f. There was "noise" in the data such that Invuity had difficulty accurately predicting the profitability of its sales (*See* ¶81).

88. The Individual Defendants' personal knowledge during the Class Period of each fact described in ¶87 is supported by a number of factual allegations, including: (1) the accounts of former employees; (2) the Individual Defendants' meetings with analysts repeat their false claims regarding operational success; (3) the secondary stock offering conducted on July 1, 2017; and (4) the core operations doctrine.

**CONFIDENTIAL WITNESSES**

89. Reports from former employees of Invuity confirm that, during the Class Period, the step-back sales pattern was well recognized company-wide. Sales personnel from geographically dispersed areas consistently corroborate the fact that a large portion of each initial orders consisted of the sale of retractors and other capital products that were not subject to being reordered throughout the Class Period and that follow up second orders regularly were much smaller than initial sales. The former employees also describe how the ratio of capital to disposables was closely tracked by Invuity's top management.

90. Reports from former employees also confirm that sales incentives approved by Defendant Sawyer were common throughout the Class Period and had the effect of allowing for the sale of more disposables than were being used in a quarter. As a result, overstocked customers

would not purchase additional disposable products the quarter following the purchase because doctors were not sufficiently utilizing the product to justify the additional purchases. The former employees consistently describe how selling deeper into accounts required constant attention by the sales personnel to ensure the product was being used, but Invuity's incentive structure, approved by the Individual Defendants, did not incentivize that effort.

**Confidential Witness No. 1**

91. Confidential Witness 1 ("CW1") was employed by Invuity between June 2015 and February 2017 as Director of National Accounts. CW1's responsibilities included overseeing national accounts for the Company and attempting to achieve set sales goals for capital equipment and disposable products. Because of CW1's responsibilities, CW1 was familiar with Invuity's practice of providing customers retractors if they would buy disposable products.

92. CW1 explained that in February 2016 a new sales approach was rolled out by VP of Sales Bob Gerberich ("Gerberich") and Defendant Sawyer. The new approach involved, in some cases, giving away retractors. In other cases, customers were offered two-for-one deals on retractors if the customer agreed to purchase large quantities of disposables.

93. Specifically, CW1 said that by the summer of 2016, Invuity would give customers retractors if they would buy disposables. For example, if a customer bought their first 50 disposables, Invuity would give them retractors. CW1 said that Invuity ran the specials at the end of the quarters, but that if a customer had two quarters with the Company, Invuity might leverage new purchases and have them buy 100 disposals instead of 50.

94. CW1 also explained the material impact of the give-aways and incentives. CW1 stated that, as a result, a sales person would sell three months of business all at once. Salespeople would make their number, but would be faced with the problem of figuring out how to make sure that customers use the disposables in that quarter, or the salespeople would be faced with no business from those customers in the following quarter. CW1 said this impact from the incentives was company-wide.

95. CW1 stated further that Defendant Sawyer contacted sales representatives directly to ask questions about sales and to confirm that salespeople were not "sandbagging" – *i.e.*

delaying sales that could be made at the present time until a later time to spread the sales across different quota periods.

**Confidential Witness No. 2**

96. Confidential Witness 2 ("CW2") was employed by Invuity between January 2016 and June 2016 as a Key Account Manager. CW2 was responsible for providing sales information to the regional manager, attempting to meet quotas for sales of the Company's products, and contacting hospitals in an attempt to have them purchase more of Invuity's products.

97. CW2 stated that when CW2 joined Invuity, CW2 was told the area of responsibility contained 14 active accounts. CW2 stated that most of the customers for active accounts had only ordered the product one time.

98. CW2 described difficulties faced by the sales staff to maintain the accounts. Sales personnel would have to chase customers every day because Invuity's products were not needed. CW2 also observed that salespeople could talk hospitals into buying retractors, but if the sale people did not follow up, Invuity's product would not get used and there would not be any sales for disposables.

**Confidential Witness No. 3**

99. Confidential Witness 3 ("CW3") was employed by Invuity between November 2014 and August 2016 as an Area Sales Manager. CW3 was responsible for driving sales for the Company's surgical-illumination platform across a wide range of specialties, including: breast; plastics; surgical oncology; thoracic; GYN; ENT; and ortho. CW3 was also responsible for opening new accounts and expanding sales through account utilization.

100. CW3 explained that sales quotas were set by senior management and assigned to area sales managers by the director of the region. CW3 stated commissions were paid based on both capital purchases and disposables. CW3 also stated that Invuity closely tracked which portion of CW3's sales was attributable to capital expenditures and which portion was attributable to one-time use products.

101. CW3 stated Invuity tracked year-over-year and month-over-month sales in both capital and disposables, and tracked sales to each specific hospital.

102. CW3 confirmed the fact that an active account's second order was usually smaller than its first order because the second order was only for disposable products. CW3 stated that hospitals distinguish between capital expenditures and disposable purchases. According to CW3, the capital budget is capped, while the budget for disposable products was unlimited. CW3 also stated that a hospital would order disposable products directly from Invuity after the initial order, which allowed Invuity to track all disposable sales.

**Confidential Witness No. 4**

103. Confidential Witness 4 ("CW4") was employed by Invuity between September 2015 and August 2016 as an Area Sales Manager. CW4 was responsible for overseeing sales of Invuity's products within CW4's region and monitoring accounts for sales of the Company's products.

104. CW4 stated that Invuity's sales strategy involved hiring established top salespeople in the industry in order to gain access to their personal networks of surgeons. Invuity would then increase the sales quotas to unrealistic levels compared to the previous quarter. CW4 described this practice as "turn and burn" within the sales force.

105. CW4 explained that the first sale was the big money order. After the initial capital investment, customers reordered disposable products as they were used. CW4 noted that with an established account, the salesperson had to go back to make sure Invuity products were being used, but that such return trips did not produce as much money.

**Confidential Witness No. 5**

106. Confidential Witness 5 ("CW5") was employed by Invuity between May 2014 and May 2016 as an Area Sales Manager. CW5 was responsible for overseeing sales of the Company's products in CW5's territory and monitoring accounts for sales of Invuity's products. CW5 reported to Regional Sales Director Jeff Didde and reported to Area VP & Senior Director of US Sales Anthony Carnemolla ("Carnemolla") who, in turn, reported to VP of Sales Gerberich.

107. CW5 observed that the push to sell disposable products had the effect of causing sales to level off the following quarter.

108. CW5 said that salespeople would work with their Area Director [Regional Manager] to put together deals to sell more products near the end of each quarter. For instance, if a customer bought $30,000 of capital product (such as sets of "I-tongs"), the customer could get a two-for-one deal, or could buy a second set of I-tongs for half the price. In other cases, customers could buy 10 lights and get one or two free. CW5 said these incentives and special pricing deals were approved by the VP of Sales Gerberich. CW5 said this was how 80% of sales were achieved.

109. CW5 stated that, during CW5's employment, salespeople were hired based on the established relationships they had with hospitals and doctors. As a result of these relationships, salespeople would tell their customers how much inventory to carry. The hospitals and doctors would trust them because they already knew them.

110. CW5 stated, however, that procedures utilizing Invuity's products included an "uplift" of $400 per procedure. As a result, CW5 observed that surgeons did not use the product as often as they could due to the increase in cost per procedure.

**Confidential Witness No. 6**

111. Confidential Witness 6 ("CW6") was employed by Invuity between June 2012 and February 2018 as a National Sales Director. CW6 was responsible for managing distributors and assisting sales representatives, and therefore was in a position to know the size of orders at the Company, among other operational details.

112. CW6 stated that CEO Sawyer and CFO Mackaness attended the Company's sales meetings, and that Sawyer would often contact individual salespeople to inquire about the status of sales. CW6 said that promotions to make quarterly numbers were standard practice, and that the promotions were more aggressive at the end of quarters. CW6 said one type of promotion was "buy-one-get-one-free." CW6 said the only way to get something free was to buy a big order. For example, if a customer ordered 30 disposables, the customer could get five retractors for free.

113. CW6 stated that, as a manager of distributors who assisted the sales representatives, CW6 was aware of the size of orders. ***CW6 said in the case of large stocking orders, the second***

***order was always smaller***. CW6 noted that any order over 20 disposables meant that the customer was overstocked.

114. CW6 said there were weekly director calls every Friday at 2:00 p.m. CW6 said Defendants Sawyer and Mackaness attended at least two of these meetings at the end of each quarter. CW6 said that all promotions, including the bundling of retractors with disposables, and buy-one-get-one-free programs, were approved by CEO Sawyer and CFO Mackaness. CW6 said that promotions occurred every quarter, and there was an email distribution list for the announcement of these promotions. CW6 said that everyone in sales and senior management was on the email distribution list, including Sawyer and Mackaness. CW6 recalled promotions in the second, third, and fourth quarters of 2016.

**Confidential Witness No. 7**

115. Confidential Witness 7 ("CW7") was employed by Invuity between March 2012 and January 2017 as a Principal Engineer in Research and Development. CW7 was responsible for conducting research in illumination to improve, enhance, and facilitate outcomes during surgery.

116. CW7 stated that Invuity gave away hardware. CW7 believed that Invuity rarely sold its product for the suggested price; instead, the plan was to let doctors use the product.

**Confidential Witness No. 8**

117. Confidential Witness 8 ("CW8") was employed by Invuity between September 2015 and April 2017 as a Director of Strategic Accounts and Business Development. CW8 was responsible for overseeing various sales regions for the Company and controlled and managed issues related to districts, regions, and zones for Invuity. Specifically, CW8 was responsible for the targeted growth and implementation of the Company's proprietary technology and for supporting the sales efforts of the Invuity sales team nationally and regionally to grow sales and support Invuity programs, such as Hidden Scar Breast Cancer Surgery. CW8 was also involved in discussions with health systems on Value Based Healthcare, Triple Aim, and the importance of technology investment to address known patient, physician, and clinician safety issues within open surgical procedures.

118. CW8 stated that Invuity maintained Daily Forecast Reports that included details for all accounts, including the sales person's name, doctor's name, product type, and type of specialty that used the product. CW8 said that contrary to Defendants' public representations – such as Defendant Sawyers' representations during the Company's February 4, 2016 conference call that "we went deeper in existing accounts" and Defendant Mackaness' statements that "the trend [of going deeper] is continuing in the right direction" – these reports showed that Invuity was not getting penetration into individual hospitals. Additionally, CW8 did not see any sales representative selling into ortho, breast oncology, and spine doctors at the same hospital. CW8 also stated that products were given away free at the end of quarters to make the quarterly numbers. CW8 stated further that directors participated in weekly calls during which all regions participated. CW8 stated that the calls were led by Gerberich, and that Defendants Sawyer and Mackaness were in and out of the meetings. CW8 stated that he had a falling out with Gerberich because he told Gerberich that the Company would not be able to continue to do deals at the end of quarters on a long-term basis. CW8 stated that, on these calls, each regional manager would go over the forecast for their region in painstaking detail. CW8 also stated that order sizes were discussed on these calls.

**Confidential Witness No. 9**

119. Confidential Witness 9 ("CW9") was employed by Invuity between March 2014 and December 2016 as an Area Sales Manager/Regional Sales Trainer. CW9 was responsible for managing and promoting Invuity's sales and growth within CW9's district and region, and for training salespeople within the region.

120. CW9 stated that, toward the end of quarters, some hospitals would not have budget money for capital. In order to complete a deal, hospitals would be offered a certain number of retractors at no additional cost if they purchased a lot of disposable lights. CW9 said this strategy allowed the Company to avoid lowering the average sale price for disposable products. CW9 also stated that hospitals were given demonstration or sample retractors. Additionally, CW9 stated that retractors would normally be part of the first order, and that, as a result, follow-up orders were smaller. ***Indeed, CW9 said that stocking orders were larger and subsequent orders were***

***smaller***. CW9 also stated that director and regional managers would participate in a conference call every Friday and would go through the state of the business and employee concerns.

**Confidential Witness No. 10**

121. Confidential Witness 10 ("CW10") was employed at Invuity between March 2014 and February 2017 as a Senior Area Sales Manager and Regional Sales Trainer. CW10's responsibilities included designing and implementing training and mentoring strategies at the Company, assisting with on-boarding and training of new sales representatives in the region, helping with the training of new representatives in the Company's best practices, anatomy, product knowledge, and sales strategies, and assessing new hires.

122. CW10 stated that CEO Sawyer and CFO Mackaness were fully aware of the Company's sales results. CW10 said that CW10 participated in telephone calls and meetings with CEO Sawyer in which Sawyer had specific information regarding Invuity's sales results. CW10 stated further that Invuity's management was intensively frustrated by the Company's sales results as far back as September 2016. According to CW10, the frustration stemmed from a lack of answers and not having enough momentum to "move the needle" to make the Company's sales goals. CW10 learned this information from CW10's interactions with CEO Sawyer and with CW10's regular contact with VP of Sales Gerberich, Area VP & Senior Director of U.S. Sales Carnemolla, and Area VP of Sales Stephen Carmody.

**THE INDIVIDUAL DEFENDANTS' MEETINGS WITH ANALYSTS**

123. On June 22, 2016, an analyst for Leerink Partners issued a report entitled "Mgmt Mtgs Highlight Robust Growth & New Product Outlook." In the report, the analyst reported the Individual Defendants' private confidence in the Company's execution of its growth plan, stating in pertinent part as follows:

> **Management Meetings Highlight Strong Growth Outlook & New Products Still Ahead**
>
> ***We recently hosted investor meetings with IVTY CEO Philip Sawyer and CFO Jim Mackaness.*** We came away from the day's discussions reinforced in our view that ***key drivers are in place to sustain a 60%+ revenue [compound annual growth rate]*** over the 2015-18E period--at the higher end vs. small-cap peers--as IVTY

> drives adoption of its proprietary Intelligent Photonics technology across a variety of surgery areas representing an aggregate potential ~$2B total mkt opportunity. Reiterate OP & $15 PT.
>
> The company sees productivity being driven by: (1) a larger pool of customers; (2) deeper penetration across hospitals in multiple specialties; and (3) an incentive structure that rewards both existing account reorders and new account openings.
>
> Mgmt believes that SG&A leverage should begin to be more apparent in 2H16 and into 2017 as a bolus of rep hires in 2H15 into 1H16 mature and see rising levels of productivity.

124. On September 22, 2016, Craig-Hallum Capital Group ("Craig-Hallum") issued a report on the Company entitled "Highlights from Management Meetings," stating in pertinent part as follows:

> **OUR CALL**
>
> ***We recently traveled with CEO Phil Sawyer and CFO Jim Mackaness and came away with increased confidence in the near-term and long-term opportunities for the company.*** We believe this stock should not be trading at a ~50% discount to the peer group and we reiterate our Buy rating.

125. The price of Invuity stock continued to soar following the positive press that cited the Individual Defendants' confidence from Sawyer and Mackaness in Invuity's operations.

**SECONDARY STOCK OFFERING**

126. During the Class Period, Invuity conducted a secondary stock offering. Before the offering occurred, Invuity was experiencing a step-back sales pattern, and knew its foreseeable and inevitable impact on Invuity's plan to generate exponential growth by going deeper into existing accounts.

127. At the time the secondary offering occurred, that Invuity was not in a position to benefit from seasonality as its growth in new accounts was primarily concentrated in the Company's breast division. These operational failures were inconsistent with Invuity's stated plan, which called for raising cash not before late 2017, if at all.

128. The timing of the secondary offering indicates that Invuity's sales were not going "exactly" as planned and modeled.

129. Specifically, on Invuity's Q4 2015 conference call held February 24, 2016, Defendant Mackaness told investors that based on current operations, the Company's cash position was secure until the later part of 2017.

130. In response to a question regarding Invuity's intent to raise cash through a stock offering, Defendant Mackaness stated:

> . . .***[W]e had no immediate plans***. As we've mentioned in the call, anticipating with the investments we're making within the sales force with some new products, we're going to – ***and the seasonality of revenue***, we're looking to see the [burn], if you like, peak in this quarter and then mitigate going forward.
>
> And so ***we feel very comfortable with the way we are*** and we see basic, and to your point, ***sort of the in the backend of 2017*** if that's – depending on how we want to run the expenses going forward on the next sort of 18 to 24 months.

131. Defendant Sawyer agreed, stating:

> And the other element to bring up there with respect to flexibilities that current models call for, ***as you say, cash comfortably lasting into the latter half of next year.*** But the cash required ***after that*** is very modest and the company has several different avenues where we choose to raise more cash whether that be the equity markets or through corporate partnering or even debt.

132. On May 5, 2016, the Individual Defendants conducted another conference call with analysts. According to Defendant Mackaness, as of March 31, 2016, Invuity maintained cash and cash equivalents of $33.9 million. Defendant Mackaness also stressed the expectation that the Company's major cash burn for the year was behind it, saying:

> Operating expenses in the first quarter are typically high due to our annual national sales meeting. In addition, this quarter also included certain one-time personnel cost. Therefore we believe that any near-term future increases in quarterly operating expenses will be fairly modest, and ***we anticipate demonstrating increased operating leverage going forward*** which gives us confidence in how we are managing our capital resources.

133. During the same conference call, Defendant Mackaness reiterated:

> As for our forward outlook, we continue to expect revenue for 2016 in the range of $35 million to $37 million. ***We continue to expect to see slightly less than 40% of our revenue occurring in the first half of the year with the balance in the second half*** based on seasonality in the recent ramp in the sales force.

134. The Individual Defendants rejected any suggestion that Invuity would need to raise cash in the near term. Defendant Mackaness responded to an analyst's question seeking to confirm Invuity "still continue[d] to feel confident in the Company's cash position" and requested information about when Invuity may seek to raise cash. Defendant Mackaness said:

> I think, ***we're performing exactly as we had it planned and modeled***. We continue to see the operating leverage play out for the rest this year. And I think as we previously mentioned, ***we feel comfortable we have cash into the latter half of 2017.***

135. Despite this denial, on July 1, 2017, Invuity filed a Form S-3 Registration Statement with the SEC (the "Registration Statement"). The Registration Statement stated that Invuity:

> ***[M]ay offer and sell from time to time***, in one or more series or issuances and on terms that Invuity will determine at the time of the offering, ***any combination of the securities described in this prospectus, up to an aggregate amount of $100,000,000***. We will provide specific terms of any offering in a supplement to this prospectus.

136. The Registration Statement included a prospectus supplement that indicated Invuity intended to sell up to $25 million worth of Company shares.

137. During the July 19, 2016 earnings call, Defendant Mackaness reiterated that the Company was following through with its plan to reduce cash burn in the second half of 2016, saying:

> We had previously commented that with the majority of our new sales rep hiring occurring in the fourth quarter of 2015 and into the first quarter of 2016, ***we expected our overall operating expenses to start to stabilize, and we see our second-quarter performance in line with that expectation***.

138. Defendant Mackaness further discussed earnings guidance for the remainder of the year and reiterated that cash usage was proceeding as planned:

> Turning to the rest of the year, ***we are maintaining our revenue guidance for 2016 of $35 million to $37 million***.
>
> ****
>
> ***Our current plans call for any near-term future increases in quarterly operating expenses to be fairly modest,*** and we anticipate demonstrating continued operating leverage going forward. We've also previously communicated that cash burn would peak in the first quarter and begin to mitigate through the rest of 2016. ***Our performance in the second quarter supports this belief and we see this trend continuing.***

139. The same day, Invuity nonetheless filed with the SEC a letter requesting the Registration Statement be declared effective as of 4:30 p.m. Eastern Time, July 21, 2016.

140. On July 27, 2016, Invuity filed a preliminary prospectus supplement with the SEC indicating its intent to commence a secondary offering.

141. On July 28, 2016, Invuity supplemented its Registration Statement with a prospectus and offered 2,800,000 shares of its common stock a price of $10 per share to raise gross proceeds of $28 million. In addition, the Company announced that underwriters received a 30-day option to purchase up to 420,000 additional shares of its common stock, to cover over-allotments, if any. The Company expected to receive net proceeds of approximately $25.9 million or $29.9 million if the underwriters exercise in full their option to purchase additional shares, after deducting underwriting discounts and commissions and estimated offering expenses payable. The Company stated its intention to use the proceeds for: (i) the continued expansion of its sales and marketing activities; (ii) investments in R&D; (iii) potential acquisitions or investments in complementary products, technologies or businesses; and (iv) working capital and other general corporate purposes. The offering was expected to be completed on or about August 2, 2016.

142. On August 3, 2016, Invuity completed its public offering of 3.22 million shares of its common stock, including the underwriters over allotment option to purchase 420,000 shares at a price of $10 per share for gross proceeds of $32.3 million. Despite the dilutive effect of the secondary offering, Invuity's stock price continued to climb.

**THE INDIVIDUAL DEFENDANTS' INVOLVEMENT IN OPERATIONS**

143. Plaintiff's allegations concerning Defendants' materially false and misleading statements and omissions and Defendants' scienter are based, in part, upon interviews with former Invuity employees who described Defendant Sawyer's participation in setting sales practices designed to take advantage of personal networks developed by top salespeople in the industry to obtain large initial capital orders, subsequently followed by smaller orders of disposable items as the product was used. This system led to heavy turnover as sales quotas increased and salespeople exhausted their personal networks.

144. By February 2016, Defendant Sawyer and Gerberich had approved and implemented sales practices that contributed to creating the step-back sales pattern. The plan involved offering undisclosed discounts on retractors to induce customers to purchase large quantities of disposable products that they did not immediately need. This process contributed to follow up orders that were significantly smaller than initial orders because the product volumes sold did not match the actual utilization of the disposable products.

145. On the Invuity's February 24, 2016 conference call with analysts, Defendant Sawyer also disclosed his personal involvement in overseeing the Hidden Scar Program. In response to a question about hospital adoption, Sawyer explained:

> ***I went***, for instance, ***in a few hospitals last week with one of our reps in Florida and in contrast we met with, in one of the hospitals, the head of marketing, the head of business development, someone in charge of scans and then a few other key surgeons.***

146. Defendant Sawyer also touted his access to real-time sales data, when in his February 24 prepared remarks he said:

> To further capitalize on these programs, we continue to attract and hire top notch reps from the elite surgical technology companies. ***The real-time data is showing that the latest hires are becoming productive faster than our initial classes of reps.***

147. Defendant Sawyer also noted on the February 24, 2016 conference call that the Company tracked expansion into new markets and was setting the stage for growth in the third and

fourth quarters. In discussing Invuity's effort to go deeper into accounts by expanding into gynecology procedures, Defendant Sawyer said:

> Now we are seeing this uptake in gyne and we see it as quite a significant opportunity going forward but it's important to note ***this is real time information*** from the last few months. And so you're ***not going to see the real effects on the numbers for say a couple of quarters from now*** in terms of being more of the ratio.

148. On the July 19, 2016 conference call with analysts, Defendant Sawyer again stressed his personal involvement in developing the Hidden Scar Program, a critical component for Invuity to gain access to new customers through its women's health initiative. Defendant Sawyer provided an example of how the program allowed the Company to go deeper into active accounts:

> [W]e first penetrate the hospitals through on average somewhere between two and three surgeons, and then you have an opportunity to go to more surgeons, to then go to more specialties. This is all with one or two products. Then you have an opportunity to sell additional products into the hospital and you can see how you could have easily a 5 to 10 times multiplier from when you first get into a hospital to how the business really develops over time.
>
> Also, Hidden Scar continues to help us in this push. A recent experience, we had a training course, Hidden Scar course in the Midwest. ***I was at this course*** and the chief of breast surgery at one of the most prestigious teaching hospitals in the Pacific Northwest attended the course and earned their certification. She then immediately after leaving the course required all seven attending surgeons in the breast surgery department to earn their Hidden Scar certification. Three surgeons are already certified and the other four will complete their certification by the end of this week. ***They are now an Invuity Hidden Scar Center of Excellence and their total sales since becoming a new Invuity account in March of 2016 are over $100,000.*** It's an anecdote that speaks to your question and my answer.

149. On the July 19, 2016 conference call with analysts, Defendant Mackaness likewise discussed his interaction with Invuity's VP of Sales, Gerberich, saying: "we talk to Bob who runs the sales."

150. The Individual Defendants also controlled setting the sales quotas that failed to properly incentivize the sales to go deeper into existing accounts, as confirmed by confidential witnesses.

151. On the November 3, 2016 conference call, Defendants described how the Company's compensation structure created an incentive for the sales personnel to open new accounts instead of driving deeper into existing accounts.

152. These hands-on sales practices, combined with the small size of Invuity and the importance of managing the sales force, supports the inference that the Individual Defendants knew about the step-back sales practice and its failure to comply with the stated plan to grow revenues exponentially by going deeper into active accounts.

**NO SAFE HARBOR**

153. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, they too are excluded from the protection of the statutory Safe Harbor. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

154. Invuity's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability. Defendants are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements were authorized and/or approved by an executive officer and/or director of Invuity who knew that the forward-looking statements were false. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking

statements would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

155. At all relevant times, the market for Invuity's common stock was an efficient market for the following reasons, among others:

a. Invuity's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. the Company had more than 16.93 million shares outstanding as of November 1, 2016. During the Class Period, on average, 82,487 shares of Invuity stock were traded on a daily basis, demonstrating a very active and broad market for Invuity stock and permitting a very strong presumption of an efficient market;

c. as a regulated issuer, Invuity filed periodic public reports with the SEC;

d. Invuity regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. Invuity was followed by many securities analysts who wrote reports that were distributed during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

f. unexpected material news about Invuity was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

156. As a result of the foregoing, the market for Invuity common stock promptly digested current information regarding Invuity from publicly available sources and reflected such information in Invuity's stock price. Under these circumstances, all purchasers of Invuity

common stock during the Class Period suffered similar injury through their purchase of Invuity common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

157. During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Invuity's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

158. By artificially inflating and manipulating Invuity's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed. Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 3, 2016, causing Invuity's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Invuity securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

159. As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period.

160. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

161. The declines in the price of the Company's common stock after the corrective disclosures came to light, as alleged more fully above, were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's common stock negate any inference

that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

162. The Company's stock price declined significantly at the end of the Class Period, as the Company's true financial condition was revealed to the investing public. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

163. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and/or entities who purchased or acquired the common stock of Invuity between February 24, 2016 and November 3, 2016, inclusive (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

164. Class members are so numerous that joinder of them is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

165. Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Invuity common stock; and (e) the extent of and appropriate measure of damages.

166. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act**
**and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

167. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

168. Throughout the Class Period, Defendants Invuity and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Invuity common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

169. During the Class Period, Invuity and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Invuity common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Invuity common stock at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Invuity and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

170. In addition to the duties of full disclosure imposed on Invuity and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Invuity's operations and performance that would be material to investors in compliance with the integrated

disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

171. Invuity and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

172. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Invuity common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Invuity common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Invuity and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Invuity stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

173. Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Invuity and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Invuity shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174. By virtue of the foregoing, Invuity and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II
## For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

175. Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

176. The Individual Defendants had control over Invuity and made the material false and misleading statements and omissions on behalf of Invuity within the meaning of §20(a) of the

Exchange Act as alleged herein. By virtue of their executive positions and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

177. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

178. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

179. By reason of such wrongful conduct, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 12, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*

Lionel Z. Glancy
Robert V. Prongay
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**HOLZER & HOLZER LLC**
Corey D. Holzer
Marshall Dees
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 12, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 12, 2019, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II